10-3635-cv
Galloway v. Town of Greece

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: September 12, 2011          Decided: May 17, 2012)

Docket No. 10-3635-cv

SUSAN GALLOWAY and LINDA STEPHENS,

*Plaintiffs-Appellants*,

– v. –

TOWN OF GREECE

*Defendant-Appellee*,

– and –

JOHN AUBERGER,
in his official capacity as Town of Greece Supervisor,

*Defendant.*[*]

Before: CALABRESI, WESLEY, and LYNCH, *Circuit Judges*.

Susan Galloway and Linda Stephens appeal from a grant of summary judgment dismissing their challenge to the legislative prayer practice at Town Board meetings in the Town of Greece, New York. We hold that the district court erred in rejecting plaintiffs' argument that the town's prayer practice affiliated the town with a single creed, Christianity, in violation of the Establishment Clause. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

[*] The Clerk of Court is directed to amend the official caption as shown above.

1

AYESHA N. KHAN (Robert Shapiro, *on the brief*), Americans United for Separation of Church and State, Washington D.C., *for Plaintiffs-Appellants*.

JOEL OSTER, Alliance Defense Fund (Kevin Theriot, Alliance Defense Fund, and Laurence D. Behr, Barth Sullivan Behr, *on the brief*), Leawood, Kan., *for Defendants-Appellees*.

Roy S. Moore, Benjamin D. DuPré, and John A. Eidsmoe, Foundation for Moral Law, Montgomery, Ala., *for Amici Curiae Foundation for Moral Law in support of Defendants-Appellees*.

Jeffrey C. Mateer, Hiram S. Sasser, III, and Justin E. Butterfield, Liberty Institute, Plano, Tex., *for Amicus Curiae Liberty Institute in support of Defendants-Appellees*.

Steven W. Fitschen and Douglas E. Meyers, The National Legal Foundation, Virginia Beach, Va., *for Amicus Curiae WallBuilders Inc. in support of Defendants-Appellees*.

CALABRESI, *Circuit Judge*:

Since 1999, the Town of Greece, New York, has begun its Town Board meetings with a short prayer. In 2008, town residents Susan Galloway and Linda Stephens brought suit against the town and Town Supervisor John Auberger in the United States District Court for the Western District of New York, asserting that aspects of this prayer practice violated the Establishment Clause. The district court (Charles J. Siragusa, *J.*) granted the defendants' motion for summary judgment, and the plaintiffs appeal. We hold that, on this record, the district court erred in rejecting the plaintiffs' argument that the prayer practice impermissibly affiliated the town with a single creed, Christianity. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

2

## I. BACKGROUND

For the most part, the facts at issue are not disputed. The parties dispute how to characterize the facts, but they agree, in nearly every regard, as to the facts themselves.

The Town of Greece is a municipal corporation located in Monroe County, New York, just outside the city of Rochester. As of the 2000 census, the town had roughly 94,000 residents. An elected, five-member Town Board governs the town and conducts official business at monthly public meetings. At these meetings, the Board votes on proposed ordinances, conducts public hearings, bestows citizenship awards, swears in new town employees, and the like. Residents and town employees attend Town Board meetings to monitor and participate in these aspects of town governance. At times, children are among the residents attending town meetings; members of Boy Scout troops and other student groups have led the Pledge of Allegiance, and high school students may fulfill a state-mandated civics requirement necessary for graduation by going to Board meetings.

Before 1999, Town Board meetings began with a moment of silence. That year, at Auberger's direction, the town began inviting local clergy to offer an opening prayer. Typically, Auberger has called each meeting to order, the Town Clerk has called the roll of Board members, and Auberger has then asked the audience to rise for the Pledge of Allegiance. After the audience has been seated following the Pledge, Auberger has introduced the month's prayer-giver, who has delivered the prayer over the Board's public address system. Prayer-givers have often asked members of the audience to participate by bowing their heads, standing, or joining in the prayer. After the prayer's conclusion, Auberger has typically thanked prayer-givers for being the town's "chaplain of the month,"

3

at times also presenting them with a plaque. The town has consistently listed the prayer in each meeting's official minutes.

Between 1999 and June 2010, when the record in this litigation closed, the town did not adopt any formal policy regarding (a) the process for inviting prayer-givers, (b) the permissible content of prayers, or (c) any other aspect of its prayer practice. The town claims that anyone may request to give an invocation, including adherents of any religion, atheists, and the nonreligious, and that it has never rejected such a request. The town also asserts that it does not review the language of prayers before they are delivered, and that it would not censor an invocation, no matter how unusual or offensive its content. When Galloway and Stephens complained about the town's prayer practice in 2007, the town explained the above-mentioned practices. The town acknowledges, however, that it has not publicized to town residents that anyone may volunteer to deliver prayers or that any type of invocation would be permissible.

In practice, Christian clergy members have delivered nearly all of the prayers relevant to this litigation, and have done so at the town's invitation. From 1999 through 2007, every prayer-giver who gave the invocation met this description. In 2008, after Galloway and Stephens had begun complaining to the town about its prayer practice, non-Christians delivered the prayer at four of the twelve Town Board meetings. A Wiccan priestess and the chairman of the local Baha'i congregation each delivered one of these prayers, and a lay Jewish man delivered the remaining two. The town invited the Wiccan priestess and the lay Jewish man after they inquired about delivering prayers; it appears that the town invited the Baha'i chairman without receiving such an inquiry. However, between

4

January 2009 and June 2010, when the record closed, all the prayer-givers were once again invited Christian clergy.

Although the town did not adopt, prior to June 2010, a formal policy concerning the selection of prayer-givers, it developed a more or less standard procedure. Three successive employees at the town's Office of Constituent Services had responsibility for inviting clergy to deliver prayers. The employee first charged with this task initially solicited clergy by telephoning, at various times, all the religious organizations listed in the town's Community Guide, a publication of the Greece Chamber of Commerce. Thereafter, this employee, Linda Sofia, compiled a "Town Board Chaplain" list containing the names of individuals who had accepted invitations to give prayers. Sofia and the two employees who succeeded her in this role testified that they worked their way down the list, calling clergy about a week before each Town Board meeting until they found someone willing to give the prayer. They also testified that they updated the list periodically based on requests from community members and on new listings in the Community Guide and a local newspaper, the *Greece Post*.

Until 2008, the "Town Board Chaplain" list contained only Christian organizations and clergy. Religious congregations in the town are primarily Christian. Galloway and Stephens have both lived in or near Greece for more than thirty years, and both testified that they were unaware of any non-Christian places of worship in the town. In the district court, the plaintiffs introduced a map indicating the presence of a Buddhist temple in the town as well as several Jewish synagogues located just outside the town. There is no indication, however, that these organizations were listed in the Community Guide or the *Greece Post*. The map illustrated, moreover, that almost all of the organizations on the town's prayer list,

unlike the synagogues, were located within the town limits. In 2008, the town added to the list the Wiccan priestess, the lay Jewish man, and the Baha'i congregation leader mentioned above.

In all, there were roughly 130 different invocations between 1999 and June 2010, of which more than 120 are contained within the record.[1] The invocations in the record typically gave thanks for aspects of the life of the town and requested assistance with the ongoing project of town governance. After being introduced, prayer-givers tended to begin with some variant of "let us pray," and then to speak about the matters for which "we" pray, ostensibly on behalf of the audience or the town more broadly. Members of the audience and the Board have bowed their heads, stood, and participated in the prayers by saying "Amen." On a few occasions, some members of the Town Board have made the sign of the cross.

A substantial majority of the prayers in the record contained uniquely Christian language. Roughly two-thirds contained references to "Jesus Christ," "Jesus," "Your Son," or the "Holy Spirit." Within this subset, almost all concluded with a statement that the prayer had been given in Jesus Christ's name. Typically, prayer-givers stated something like, "In Jesus's name we pray," or "We ask this in Christ's name." Some prayer-givers elaborated further, describing Christ as "our Savior," "God's only son," "the Lord," or part of the Holy Trinity. One prayer, for example, was given "in the name of the Lord and Savior Jesus Christ, who lives with you and the Holy Spirit, one God for ever and ever."

---

[1] Galloway and Stephens assert that between 1999 and June 2010, at least 132 spoken prayers were delivered at Board meetings. They have identified 135 Board meetings during this period, but claim that there is no evidence regarding the delivery or content of prayers at three of the meetings. Galloway and Stephens also assert that transcripts of 124 of these 132 prayers are available in the record. The town does not dispute these figures. We, however, have only been able to identify transcripts of 121 prayers in the record.

6

Other prayers, including ones not expressly made in Christ's name, spoke of "the role of the Holy Spirit in our lives," and celebrated Christ's birth and resurrection.

The remaining third of the prayers spoke in more generically theistic terms. Christian clergy delivered prayers referring to "God of all creation," "Heavenly Father," and God's "kingdom of Heaven." The lay Jewish prayer-giver spoke of "God," the "Father," and the "Lord"; he also referenced, at one point, "the songs of David, your servant." The Baha'i prayer-giver referred generally to "God," concluding his prayer with the Baha'i greeting, "Alláh-u-Abhá," which loosely means "God the All Glorious." Finally, the Wiccan priestess invoked Athena and Apollo; she stated these were fitting deities given the Town's name.

Galloway and Stephens attended numerous Town Board meetings after the town initiated its prayer practice in 1999.[2] In September 2007, they began complaining to town officials about the prayer practice, sometimes during public comment periods at Board meetings. In these informal complaints, the plaintiffs raised two types of objections, though they did not distinguish them as such. First, they asserted that the prayers aligned the town with Christianity. Second, they argued that the prayers were sectarian rather than secular. Town officials met with the plaintiffs and expressed the town's position that it would accept any volunteer to deliver the prayers and that it would not police the content of prayers. The town did not make any public response to the plaintiffs' complaints, however. Nor did it make any comment concerning the prayer delivered at an October 2007 meeting, which

---

[2] Stephens started attending meetings in 2001, and Galloway began in 2005. At the time of their complaint, both plaintiffs recalled the prayers at three meetings in particular, with one overlapping meeting between the two of them. In their complaint, they asserted that they had attended other meetings as well. There is no dispute that the plaintiffs have attended nearly every meeting since they started objecting to the invocations.

described objectors to the town's prayer practice as a "minority . . . ignorant of the history of our country."

In February 2008, the plaintiffs filed suit against the town and Auberger, challenging aspects of the prayer practice under the Establishment Clause. They made two arguments before the district court: (1) that the town's procedure for selecting prayer-givers unconstitutionally preferred Christianity over other faiths, and (2) that the prayer practice was impermissibly "sectarian." In support of their position, the plaintiffs reiterated the same objections they had raised before the Town Board prior to filing suit. They claimed, as an initial matter, that the prayer practice aligned the town with Christianity, and that it therefore established a particular religion. They also pointed out that the prayer practice employed language unique to specific religious sects, and asserted that in so doing it established religion generally. The plaintiffs again did not distinguish between these arguments, nor have they done so on appeal.

The district court, on cross-motions for summary judgment, entered judgment for the defendants. *Galloway v. Town of Greece*, 732 F. Supp. 2d 195 (W.D.N.Y. 2010). At the outset, the district court dismissed the plaintiffs' claims against Auberger as redundant of their claims against the town. *Id.* at 214. After holding that the plaintiffs had Article III standing to sue the town, the district court turned to the merits of their two arguments. *Id.* at 214-15. As to the plaintiffs' challenge regarding the town's prayer selection process, the district court held that the plaintiffs had failed to advance any credible evidence that town employees intentionally excluded representatives of particular faiths. *Id.* at 215-19. As to the plaintiffs' contention regarding the sectarian content of the prayers, the district court held that, under binding Supreme Court case law, the Establishment Clause does not foreclose

8

denominational prayers. The court concluded for these, and for a number of case-specific reasons, that the plaintiffs had failed to show that the town's prayer practice had the effect of establishing the Christian religion. *Id.* at 238-43.

## II.  DISCUSSION

This appeal presents a narrow subset of the questions raised before the district court. Galloway and Stephens do not assert that the district court erred in dismissing their claims against Auberger. They have, moreover, expressly abandoned the argument that the town intentionally discriminated against non-Christians in its selection of prayer-givers. Accordingly, the only live issue on appeal is whether the district court erred in rejecting the plaintiffs' assertion that the town's prayer practice had the effect, even if not the purpose, of establishing religion.

We review a grant of summary judgment de novo. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010). "Summary judgment is warranted only where construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)) (internal quotation marks omitted).

### A.

As far as we are aware, this is the first instance in which this court has had occasion to consider the validity of a legislative prayer practice under the Establishment Clause. Our analysis must begin with *Marsh v. Chambers*, 463 U.S. 783 (1983), the only Supreme Court decision cited to us that has ruled on the constitutionality of legislative prayer. *Marsh* held

that the Nebraska legislature's practice of opening its sessions with a prayer, delivered by a state-employed clergyman, did not violate the Establishment Clause. *Id.* at 793. In so holding, *Marsh* did not employ the three-pronged test the Court had adopted, eleven years earlier, in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), for Establishment Clause cases. *Marsh*, 463 U.S. at 793-95; *see also Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987). Rather, the *Marsh* Court conducted a largely historical analysis, looking to the "unique history" of legislative prayer in America before turning to the particulars of the Nebraska Legislature's chaplaincy program. *Marsh*, 463 U.S. at 791-95.

The Court first held that state-funded legislative prayer does not necessarily run afoul of the Establishment Clause. It relied primarily on the fact that the First Congress appointed paid chaplains and opened legislative sessions with prayer, and reasoned that "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment." *Id.* at 788. The Court also found that delegates to the First Congress "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's 'official seal of approval on one religious view,'" *id.* at 792 (quoting *Chambers v. Marsh*, 675 F.2d 228, 234 (8th Cir. 1982)), but rather viewed them as "'conduct whose . . . effect . . . harmonize[d] with the tenets of some or all religions,'" *id.* (alterations in original) (quoting *McGowan v. Maryland*, 366 U.S. 420, 422 (1961)). "To invoke Divine guidance on a public body entrusted with making the laws," the Court held, is "simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id.*

Turning to Nebraska's practice, the Court dismissed three concerns raised by the state legislator who was plaintiff in the case. First, it rejected the argument that the sixteen-

year tenure of the legislative chaplain, Robert E. Palmer, had "the effect of giving preference to his religious views." *Id.* at 793. The evidence, the Court noted, suggested that Palmer was reappointed because of his performance and indicated that guest chaplains and substitutes had officiated at various times. *Id.* The Court held that "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive," Palmer's long tenure did not "in itself" violate the Establishment Clause. *Id.* at 793-94.

Second, the Court rejected the claim that Palmer's compensation from public funds conflicted with the Establishment Clause. It again noted that the First Congress had paid its chaplain, as had the Continental Congress and various state legislatures at the time of the Constitutional Convention. *Id.* at 794. The Court also relied on the fact that both Congress and many state legislatures had long since continued to compensate chaplains who delivered legislative prayers. *Id.*

Third, the Court rejected the argument that the "Judeo-Christian" content of the prayers established religion. In describing the facts underlying this portion of the plaintiff's complaint, the Court reported that Palmer had characterized his prayers as "'nonsectarian,' 'Judeo Christian,' and with 'elements of the American civil religion.'" *Id.* at 793 n.14. It also pointed out that "[a]lthough some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator." *Id.* In responding to plaintiff's argument, the Court reasoned that "[t]he content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95. For these reasons, the Court concluded, it was not necessary for it "to embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 795.

11

Six years later, however, in a case that did not involve a challenge to legislative prayer, the Supreme Court suggested that legislative prayers invoking particular sectarian beliefs may, on the basis of those references alone, violate the Establishment Clause. The decision, *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), rejected the argument that *Marsh*'s historical analysis validated a city's holiday crèche display. The Court wrote: "However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *Id.* at 603 (footnote omitted). *Marsh*, it reasoned, recognized that history could not justify current practices "that have the effect of affiliating the government with any one specific faith or belief." *Id.* The prayers in *Marsh* "did not violate this principle," according to the Court, "because the particular chaplain had 'removed all references to Christ.'" *Id.* (quoting *Marsh*, 463 U.S. at 793 n.14).

As read by *Allegheny*, *Marsh* has remained a fixed point within the High Court's Establishment Clause jurisprudence. Three years later, in striking down a public school district's practice of including prayer in its graduation ceremonies, the Court distinguished *Marsh* in light of "[i]nherent differences between the public school system and a session of a state legislature." *Lee v. Weisman*, 505 U.S. 577, 596 (1992). In doing so, it pointed specifically to the difference between "[t]he influence and force of a formal exercise in a school graduation" as against a legislative session. *Id.* at 597. More recently, in noting that "Establishment Clause doctrine lacks the comfort of categorical absolutes," the Court invoked *Marsh* as an instance in which it had "found good reason to hold governmental

12

action legitimate even where its manifest purpose was presumably religious." *McCreary Cnty., Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 860 n.10 (2005).

B.

Various circuit court decisions, drawing on the Court's language in *Allegheny*, have questioned the validity of all forms of "sectarian" prayers. In the most recent of these, Judge Wilkinson wrote for the Fourth Circuit that *Marsh* and *Allegheny*, read together, seek both to acknowledge that legislative prayer can "solemnize the weighty task of governance" and to minimize the risks of "sectarian strife" such prayer may generate by requiring that invocations "embrace a non-sectarian ideal." *Joyner v. Forsyth Cnty., N.C.*, 653 F.3d 341, 347 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 1097 (2012); *see also Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006) (holding that the Supreme Court, in *Allegheny*, "read *Marsh* as precluding sectarian prayer"); *Stein v. Plainwell Cmty. Schs.*, 822 F.2d 1406, 1409 (6th Cir. 1987) (reading *Marsh*, prior to *Allegheny*, to hold that prayers will violate the First Amendment if they go "beyond 'the American civil religion'" (quoting *Marsh*, 463 U.S. at 793 n.14)).

To the extent that these circuit cases stand for the proposition that a given legislative prayer practice, viewed in its entirety, may not advance a single religious sect, we cannot disagree. Under *Marsh*, legislative prayers may not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-95. It is also clear, under *Allegheny*, that legislative prayers may not "have the effect of affiliating the government with any one specific faith or belief." *Allegheny*, 492 U.S. at 603. *Joyner*, *Hinrichs*, and *Stein* might be read simply to reiterate these standards, rather than to construe *Marsh* and *Allegheny* as precluding denominational content in any individual prayer. Construed in this fashion, the distinction between sectarian and nonsectarian prayers merely

serves as a shorthand, albeit a potentially confusing one, for the prohibition on religious advancement or affiliation outlined in *Marsh* and *Allegheny*.

To the extent that these circuit cases stand instead for the proposition that the Establishment Clause precludes all legislative invocations that are denominational in nature, however, we cannot agree. The line between sectarian and nonsectarian prayers, though perhaps the least defective among various possible distinctions that can be drawn in this area, runs into two sizable doctrinal problems.

First, the Supreme Court has explicitly rejected the notion that the government "may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds." *Lee*, 505 U.S. at 590. Admittedly, *Lee*, which postdated both *Marsh* and *Allegheny*, did not involve legislative prayer. But its language was seemingly unequivocal. The *Lee* Court held that the defendant public school district had violated the Establishment Clause when it advised a rabbi that his prayers at the school's graduation ceremony "should be nonsectarian." *Id.* at 588. A state-imposed requirement that all legislative prayers be nondenominational, the Court reasoned, begins to sound like the establishment of "an official or civic religion." *Id.* at 590. Indeed, *Lee* made express its disagreement with the Sixth Circuit's contrary language in *Stein*. *Id.* at 589. The problem with such civic religious statements lies, in part, in the danger that such efforts to secure religious "neutrality" may produce "a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious." *Sch. Dist. of Abington Twp., Pa., v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring); *see also Lee*, 505 U.S. at 589-90 (expressing similar concerns). Under the First Amendment, the government may not establish a vague theism as a state religion any more than it may establish a specific creed.

14

The second difficulty with the simple sectarian/nonsectarian approach seemingly adopted by some circuits is that the touchstone of our analysis must be *Marsh*, which is hard to read, even in light of *Allegheny*, as saying that denominational prayers, in and of themselves, violate the Establishment Clause. It is true that *Allegheny* pointed out that the prayers in *Marsh* did not have "the effect of affiliating the government with any one specific faith or belief . . . . because the particular chaplain had 'removed all references to Christ.'" 492 U.S. at 603 (quoting *Marsh*, 463 U.S. at 793 n.14). But this does not mean that any *single* denominational prayer has the forbidden effect of affiliating the government with any one faith. A series of denominational prayers, each delivered in the name of a different sect, could hardly be perceived as having this effect. *Cf. Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1277-78 (11th Cir. 2008) (upholding a prayer practice in part because prayers referenced Allah, Mohammed, and the Torah in addition to Christ). At any rate, the chaplain's categorization of the prayers in *Marsh* as "nonsectarian" was plainly contestable with respect to prayers delivered prior to the 1980 complaint. *See Marsh*, 463 U.S. at 793 n.14 (describing some of these prayers as "often explicitly Christian"); *id.* at 823-24 (Stevens, J., dissenting) (quoting one of the chaplain's prayers). And it is not even clear that the removal of references to Christ rendered all post-1980 prayers nondenominational.

Accordingly, our inquiry cannot look solely to whether the town's legislative prayer practice contained sectarian references. We must ask, instead, whether the town's practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that the town favored or disfavored certain religious beliefs.[3] In other words, we must ask whether the

---

[3] The town appears to argue that, because the plaintiffs do not contest the district court's ruling that the town did not intentionally favor Christian prayer-givers, the plaintiffs cannot show an Establishment Clause violation. This argument rests, apparently, on the view that to "proselytize or advance any one, or to disparage any other, faith or belief," within the meaning of *Marsh*, requires intent. *See Marsh*, 463 U.S. at 794-95. We

15

town, through its prayer practice, has established particular religious beliefs as the more acceptable ones, and others as less acceptable. This inquiry, for its part, must be made in the light of the particular prayer practice upheld in *Marsh* and addressed in *Allegheny*. As a result, it is clear, for example, that the longstanding appointment of a single Christian clergyman does not, *in itself*, convey the prohibited favoritism, and the same is apparently true of "Judeo-Christian" prayers that make no reference to Christ. Beyond that, however, any number of different legislative prayer practices could be read to yield any number of messages—acceptable or forbidden—about religion.

C.

Within these confines, we see "no test-related substitute for the exercise of legal judgment." *Van Orden v. Perry*, 545 U.S. 677, 700 (2005) (Breyer, J., concurring in the judgment). In *Marsh*, as we have noted, the Supreme Court did not employ the *Lemon* test; nor did it adopt any other precise criteria to govern cases involving legislative prayer. Instead, the decision addressed a series of case-specific concerns raised by the plaintiff. In fact-intensive cases like this one, which defy exact legal formulas, the exercise of "legal judgment" is not the same as the exercise of "personal judgment"; it must "reflect and remain faithful to the underlying purposes" of the relevant constitutional provisions, and it must "take account of context and consequences measured in light of those purposes." *Id*. With that in mind, we turn to the specific factual history in this case.[4]

---

disagree. *Marsh* did not speak of scienter. Rather, it held as it did after rejecting the argument that aspects of the prayer practice had the *effect* of giving preference to particular religious views. *See id.* at 793. *Allegheny*, moreover, held that *Marsh* had found that the prayers did not "have the *effect* of affiliating the government with any one specific faith or belief." *Allegheny*, 492 U.S. at 603 (emphasis added).

[4] On appeal, the defendants do not dispute that the plaintiffs have standing to sue. The defendants argue, however, that the plaintiffs do not have standing to challenge what was said in Town Board meetings which the plaintiffs have no specific memory of attending. The Supreme Court did not adopt such a restrictive view of the prayer practice under challenge in *Marsh*. Nor has any circuit, as far as we are aware, adopted such a

We conclude, on the record before us, that the town's prayer practice must be viewed as an endorsement of a particular religious viewpoint. This conclusion is supported by several considerations, including the prayer-giver selection process, the content of the prayers, and the contextual actions (and inactions) of prayer-givers and town officials. We emphasize that, in reaching this conclusion, we do not rely on any single aspect of the town's prayer practice, but rather on the totality of the circumstances present in this case.

The town's process for selecting prayer-givers virtually ensured a Christian viewpoint. Christian clergy delivered each and every one of the prayers for the first nine years of the town's prayer practice, and nearly all of the prayers thereafter. In the town's view, the preponderance of Christian clergy was the result of a random selection process. The randomness of the process, however, was limited by the town's practice of inviting clergy almost exclusively from places of worship located within the town's borders. The town fails to recognize that its residents may hold religious beliefs that are not represented by a place of worship within the town. Such residents may be members of congregations in nearby towns or, indeed, may not be affiliated with any congregation. The town is not a community of religious institutions, but of individual residents, and, at the least, it must serve those residents without favor or disfavor to any creed or belief.[5]

In our view, whether a town's prayer-selection process constitutes an establishment of religion depends on the extent to which the selection process results in a perspective that

view in assessing a challenge to legislative prayer. Indeed, in *Pelphrey*, the Eleventh Circuit found the plaintiffs had standing, as municipal taxpayers, to challenge the defendant county's prayer practice in its entirety. 547 F.3d at 1280-81; *see also Joyner*, 653 F.3d at 349-50 (considering the defendant county's prayer practice in its entirety in assessing a challenge brought by plaintiffs who filed suit after hearing one prayer); *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 294, 298-302 (4th Cir. 2004) (considering the defendant county's prayer practice as a whole in assessing a challenge brought by a plaintiff who "regularly attended" Town Council meetings). We decline to adopt a more restrictive approach here.

[5] The randomness of the selection process was further undermined, moreover, by the reliance of the administrative personnel managing the process on a subset of the already-narrowed list consisting of a cadre of recurrent volunteers who were willing to appear frequently to give the invocation.

is substantially neutral amongst creeds. The town asserts, and there is no evidence to the contrary, that it would have accepted any and all volunteers who asked to give the prayer. But the town neither publicly solicited volunteers to deliver invocations nor informed members of the general public that volunteers would be considered or accepted, let alone welcomed, regardless of their religious beliefs or non-beliefs. Had the town publicly opened its prayer practice to volunteers in this way, its selection process could be defended more readily as random in the relevant sense.

We need not "embark on a sensitive evaluation" or "parse the content of a particular prayer," *Marsh*, 463 U.S. at 795, to recognize that most of the prayers at issue here contained uniquely Christian references and that prayers devoid of such references almost never employed references unique to some other faith.[6] It is no small thing for a non-Christian (or for a Christian, for that matter) to pray "in the name of Jesus Christ." Prayers delivered in this fashion invoke "a deity in whose divinity *only* those of the Christian faith believe," *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 300 (4th Cir. 2004), and do so to the clear exclusion of other faiths. References to Christ as "Our Savior" and invocations of the Holy Trinity do the same thing. *See Joyner*, 653 F.3d at 349-50.

The sectarian nature of the prayers, we emphasize, was not inherently a problem. The prayers in the record were not offensive in the way identified as problematic in *Marsh*: they did not preach conversion, threaten damnation to nonbelievers, downgrade other

---

[6] The town asserts that we may not consider the content of prayers absent an independent showing that the prayer opportunity has "been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794-95. This reads *Marsh*, particularly in light of *Allegheny*, too narrowly. We agree that "courts should not be in the business of policing prayers for the occasional sectarian reference," but this does not mean that courts may not consider, more broadly, the substance of the prayers under challenge. *Joyner*, 653 F.3d at 351. The other circuits that have addressed the issue, while acknowledging the limits on "parsing" prayers, have consistently looked to substance in this fashion. *See id.*; *Pelphrey*, 547 F.3d at 1277-78; *Hinrichs*, 440 F.3d at 399; *see also Wynne*, 376 F.3d at 299 n.4 (holding that its reliance on findings that challenged prayers "'frequently' invoked 'Jesus, Jesus Christ, Christ, or Savior,'" did not amount to "parsing" of prayers).

faiths, or the like. Prayers of this more offensive sort might be sufficient in themselves to give rise to an Establishment Clause violation. But we need not determine whether any single prayer at issue here suffices to give such an indication of establishment,[7] since we find that on the totality of the circumstances presented the town's prayer practice identified the town with Christianity in violation of the Establishment Clause.

The town had an obligation to consider how its prayer practice would be perceived by those who attended Town Board meetings. And, despite the homogeneity of viewpoints reflected by the invocations, the town did not explain that it intended the prayers to solemnize Board meetings, rather than to affiliate the town with any particular creed. The town never informed prayer-givers that invocations were not to be "exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." *Joyner*, 653 F.3d at 343. Absent any effort on the part of the town to explain the nature of its prayer program to attendees, the rare handful of cases, over the course of a decade, in which individuals from other faiths delivered the invocation cannot overcome the impression, created by the steady drumbeat of often specifically sectarian Christian prayers, that the town's prayer practice associated the town with the Christian religion.

We ascribe no religious animus to the town or its leaders. The town's desire to mark the solemnity of its proceedings with a prayer is understandable; Americans have done just that for more than two hundred years. But when one creed dominates others—regardless of a town's intentions—constitutional concerns come to the fore. There is no doubt that the

---

[7] We note, however, that prayers that overtly disparage those who dissent from the prayer policy as "ignorant," as at least one prayer did, or that conclude by taking up a collection on behalf of a particular congregation, as another did, tread perilously close, if they do not overstep, the line between legitimate legislative prayer and the identification of government with religion and religion with government. These incidents, however, appear to have been isolated.

town seeks to convey respect for the invocations given at its meetings. But efforts to show respect for a belief espoused in a legislative prayer entail a concomitant obligation to demonstrate respect for the beliefs of others.

Finally, it is relevant, and worthy of weight, that most prayer-givers appeared to speak on behalf of the town and its residents, rather than only on behalf of themselves. Prayer-givers often requested that the audience participate, and spoke in the first-person plural: let "us" pray, "our" savior, "we" ask, and so on. Town officials, whether intentionally or not, contributed to the impression that these prayer-givers spoke on the town's behalf. After many of the prayer-givers finished their invocations, Auberger thanked them for being "our chaplain of the month." There was testimony, as well, that members of the Town Board participated in the prayers by bowing their heads, saying "Amen," or making the sign of the Cross. The invitation to audience members to participate in the prayer, particularly by physical means such as standing or bowing their heads, placed audience members who are nonreligious or adherents of non-Christian religion in the awkward position of either participating in prayers invoking beliefs they did not share or appearing to show disrespect for the invocation, thus further projecting the message that the town endorsed, and expected its residents to endorse, a particular creed.[8]

On the record before us, taking into account all of these contextual considerations in concert, we reverse the grant of summary judgment. We conclude that an objective, reasonable person would believe that the town's prayer practice had the effect of affiliating

---

[8] Galloway and Stephens contend that the presence of children at Board meetings raises a threat of religious coercion akin to the threat at issue in *Lee*, 505 U.S. 577, and *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). The prospect of coercion is surely relevant to whether a legislative prayer practice runs afoul of the Establishment Clause. In *Marsh*, the Supreme Court took care to note that the "individual claiming injury" in that case was "an adult, presumably not readily susceptible to 'religious indoctrination,' or peer pressure." 463 U.S. at 792 (citations omitted) (quoting *Tilton v. Richardson*, 403 U.S. 672, 686 (1971)). In this case, however, as in *Marsh*, the plaintiffs are adults. And there is no reason to believe that children are any more present in Board meetings than they were in meetings of the Nebraska legislature.

the town with Christianity. In reaching this conclusion, we underscore that we do not rely on any single aspect of the town's prayer practice, but rather the interaction of the facts present in this case. The extent to which a given act conveys the message of affiliation, or fails to do so, will depend on the various circumstances that circumscribe it. Accordingly, we do not aim to specify what the Establishment Clause allows, but restrict ourselves to noting the ways in which this town must be read to have conveyed a religious affiliation.

It is true that contextual inquiries like this one can give only limited guidance to municipalities that wish to maintain a legislative prayer practice and still comply with the mandates of the Establishment Clause. As the foregoing indicates, a municipality cannot—in our judgment—ensure that its prayer practice complies with the Establishment Clause simply by stating, expressly, that it does not mean to affiliate itself with any particular faith. Nor can a municipality insulate itself from liability by adopting a lottery to select prayer-givers or by actively pursuing prayer-givers of minority faiths whose members reside within the town.[9] Similarly, there is no substantive mixture of prayer language that will, on its own, necessarily avert the appearance of affiliation.[10] Ultimately, municipalities must consider their prayer practices in context and as a whole. A municipality must ask itself whether what it does, in context, reasonably can be seen as endorsing a particular faith or creed over others. That is the delicate balancing act required by the Establishment Clause and its jurisprudence.

D.

---

[9] The task would be particularly delicate where a town is so much of one creed that even such approaches would, like a truly random selection process, nonetheless yield prayer-givers overwhelmingly of that creed.
[10] Even if there were such a substantive mixture, municipalities face constitutional limits on their ability to instruct prayer-givers about the permissible content of prayers. *See Lee*, 505 U.S. at 588-89.

21

We emphasize what we do not hold. We do not hold that the town may not open its public meetings with a prayer or invocation. Such legislative prayers, as *Marsh* holds and as we have repeatedly noted, do not violate the Establishment Clause. Nor do we hold that any prayers offered in this context must be blandly "nonsectarian." A requirement that town officials censor the invocations offered—beyond the limited requirement, recognized in *Marsh*, that prayer-givers be advised that they may not proselytize for, or disparage, particular religions—is not only not required by the Constitution, but risks establishing a "civic religion" of its own. Occasional prayers recognizing the divinities or beliefs of a particular creed, in a context that makes clear that the town is not endorsing or affiliating itself with that creed or, more broadly, with religion or non-religion, are not offensive to the Constitution. Nor are we adopting a test that permits prayers in theory but makes it impossible for a town in practice to avoid Establishment Clause problems. To the contrary, it seems to us that a practice such as the one to which the town here apparently aspired— one that is inclusive of multiple beliefs and makes clear, in public word and gesture, that the prayers offered are presented by a randomly chosen group of volunteers, who do not express an official town religion, and do not purport to speak on behalf of all the town's residents or to compel their assent to a particular belief—is fully compatible with the First Amendment.

What we do hold is that a legislative prayer practice that, however well-intentioned, conveys to a reasonable objective observer under the totality of the circumstances an official affiliation with a particular religion violates the clear command of the Establishment Clause. Where the overwhelming predominance of prayers offered are associated, often in an explicitly sectarian way, with a particular creed, and where the town takes no steps to avoid the identification, but rather conveys the impression that town officials themselves identify

22

with the sectarian prayers and that residents in attendance are expected to participate in them, a reasonable objective observer would perceive such an affiliation.

People with the best of intentions may be tempted, in the course of giving a legislative prayer, to convey their views of religious truth, and thereby run the risk of making others feel like outsiders. Even if all prayer-givers could resist this temptation, municipalities with the best of motives may still have trouble preventing the appearance of religious affiliation. Ours is a society splintered, and joined, by a wide a constellation of religious beliefs and non-beliefs. Amidst these many viewpoints, even a single circumstance may appear to suggest an affiliation. To the extent that the state cannot make demands regarding the content of legislative prayers, moreover, municipalities have few means to forestall the prayer-giver who cannot resist the urge to proselytize. These difficulties may well prompt municipalities to pause and think carefully before adopting legislative prayer, but they are not grounds on which to preclude its practice.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings consistent with this opinion. We leave it to the district court, with the assistance of the parties, to craft appropriate relief.