**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHELLEY RUBIN; MAUREEN I. FELLER, | No. 11-56318 |
| *Plaintiffs-Appellants*, | |
| | D.C. No. 2:10-cv-04046- DSF-JC |
| v. | |
| CITY OF LANCASTER, a municipal corporation, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
November 8, 2012—Pasadena, California

Filed March 26, 2013

Before: Alfred T. Goodwin and Diarmuid F. O'Scannlain,
Circuit Judges, and Jack Zouhary, District Judge.[*]

Opinion by Judge O'Scannlain

---

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's bench trial judgment in favor of the City of Lancaster in plaintiffs' 42 U.S.C. § 1983 action alleging that the city council's practice of opening its meetings with privately led prayers effected an unconstitutional establishment of religion.

The panel analyzed the City's policy and practice of soliciting volunteers from local congregations to lead the invocations regardless of the faith, denomination, or other religious belief of the congregation. The panel held that a Bishop's single reference to Jesus in an invocation did not amount to a violation of the Establishment Clause. The panel applied the history-based analysis set forth in *Marsh v. Chambers*, 463 U.S. 783 (1983), and concluded that neither the Supreme Court's decision in *Marsh*, nor in *County of Allegheny v. ACLU,* 492 U.S. 573 (1989), categorically forbids sectarian references in legislative prayer so long as legislative prayer—whether sectarian or not—does not proselytize, advance, or disparage one religion or affiliate government with a particular faith.

The panel also rejected plaintiffs' contention that viewed in context, the City's unwritten policy, practice and custom posed a First Amendment problem because the majority of city-council invocations have been Christian. The panel, focusing on the policy's neutrality and the principle of private

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

choice, not on the number of volunteers from a particular sect, saw nothing in the record or in the prayer policy to indicate that the City had affiliated itself with Christianity. The panel stated that the City did not choose the content of the prayers or the denomination of the prayer-givers and the fact that most of the invocations had been Christian was merely a function of local demographics and the choice of religious leaders who responded to the City's invitation for volunteers.

## COUNSEL

Roger Jon Diamond, Santa Monica, California, for Plaintiffs–Appellants.

Allison E. Burns (argued), David R. McEwen, and Joseph M. Adams, Stradling Yocca Carlson & Rauth, Newport Beach, California, for Defendant–Appellee.

Dean R. Broyles, National Center for Law & Policy, Escondido, California, for amicus curiae National Center for Law & Policy.

Steven W. Fitschen (argued) and Douglas E. Myers, National Legal Foundation, Virginia Beach, Virginia, for amicus curiae WallBuilders, Inc.

Jen Monk, Advocates for Faith & Freedom, Murrieta, California; and Scott W. Gaylord, Elon University Law School, Greensboro, North Carolina, for amicus curiae Independence Law Center.

Deborah J. Dewart, Justice and Freedom Fund, Swansboro, North Carolina; and James L. Hirsen, Anaheim Hills, California, for amicus curiae Justice and Freedom Fund.

Gary S. McCaleb and Brett Harvey, Alliance Defense Fund, Scottsdale, Arizona; and Kevin Theriot, Alliance Defense Fund, Leawood, Kansas, for amicus curiae Alliance Defense Fund.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a city council's practice of opening its meetings with privately led prayers effects an unconstitutional establishment of religion.

**I**

**A**

The City of Lancaster, California, typically begins each of its city-council meetings with a citizen-led invocation.[1] For years, that practice had been merely an informal one.[2] But on August 25, 2009, after receiving a cease-and-desist letter from the American Civil Liberties Union, the City

---

[1] The relevant facts, which the district court found, are undisputed.

[2] During the period in which the invocation practice was informal, "a substantial majority" of the prayers were "Christian in nature," and some "contained explicitly sectarian religious references, including specific references to Jesus Christ."

decided to commit to paper an official invocation policy. That policy sets forth a two-step procedure for soliciting volunteers. First, the city clerk "compile[s[ and maintain[s] a database . . . of the religious congregations with an established presence" in Lancaster. To gather names of local congregations to add to the master list, the clerk reviews Lancaster's *Yellow Pages* for "churches," "congregations," and "other religious assemblies"; searches the internet for any local "church," "synagogue," "temple," "chapel," or "mosque"; and consults the regional chamber of commerce and newspaper. All congregations in Lancaster are eligible to appear on the City's list. The clerk does not probe "the faith, denomination, or other religious belief" of a congregation before adding its name to the database.

Next, the clerk mails all of the listed religious groups an invitation to open a city-council meeting with an invocation. The invitation reads,

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. To maintain a spirit of respect and ecumenism, the City Council requests that the prayer opportunity not be exploited as an effort to convert others . . . nor to disparage any faith or belief different [from] that of the invocational speaker.

Elaborating on its apparent commitment to ecumenism, the policy states that it "is not intended, and shall not be implemented or construed in any way, to affiliate the City Council with, nor express the City Council's preference for, any faith or religious denomination." Instead, the policy "is

intended to acknowledge and express the City Council's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Lancaster." To that end, the City allows each congregation only three, nonconsecutive invocations a year. No person who has volunteered to pray has been turned down, and no government official has ever attempted to influence the clerk's selection or scheduling of volunteers.

In late 2009, to gauge public support for the prayer policy, the City submitted to municipal voters a nonbinding measure ("Measure I") requesting a yes-or-no vote on this question: "In response to a recent complaint, with respect to the invocations that contained a reference to Jesus Christ[,] shall the City Council continue its invocation policy in randomly selecting local clergy of different faiths to deliver the invocation without restricting the content based on their beliefs, including references to Jesus Christ?" To aid the citizenry's deliberation, the city attorney submitted to the public (as was his duty) an analysis of the prayer policy's legality, which concluded that the policy stood on firm constitutional footing. The mayor and vice-mayor also submitted a ballot argument in support of the measure, asserting that each person has a right to pray in accordance with his own beliefs and so may pray "to the deity of [his] own choosing." The measure was approved.

Shelley Rubin, a Jew, and Maureen Feller, a Christian, attended a council meeting on April 27, 2010. Bishop Henry Hearns, former mayor of Lancaster and then-current "honorary mayor," delivered the invocation. Hearns thanked God for his many kindnesses, asked God to bless the council members (among others), and closed with this entreaty: "Bring our minds to know you and in the precious, holy and

righteous and matchless name of Jesus I pray this prayer. Amen and Amen. God bless you." Because Hearns had invoked the name of Jesus, Rubin and Feller "were upset and offended." Neither plans to attend another council meeting until references to Jesus are forbidden.

Between the day Lancaster ratified its policy and the day of Hearns's invocation, twenty prayers were given by members of Christian denominations (and each mentioned Jesus's name), four were given by a self-identified "metaphysicist," one was given by a Sikh, and another by a Muslim. Since then, nine invocations have mentioned Jesus, and five have not.

**B**

A week after Hearns's invocation, Rubin and Feller sued the City of Lancaster in California state court under 42 U.S.C. § 1983 and Article I, Section 4 of the California Constitution. Rubin and Feller specifically requested declaratory and injunctive relief from the City's policy of permitting prayers that mention Jesus, arguing that both the invocations and the policy amounted to an establishment of religion. The City removed to federal court.

The district court held a bench trial and rejected Rubin and Feller's claims. The court reasoned that unless legislative prayer proselytizes, advances, or disparages a particular faith, it does not violate the First Amendment simply because it contains sectarian references. The mere mention of Jesus in the April 27 invocation, therefore, did not cross the constitutional line. The district court also rejected Rubin and Feller's argument that the prayer practice itself transgressed the First Amendment. "Volunteers of numerous

faiths are invited to and have given invocations before City Council meetings," the court noted, "and the selection process does not discriminate against any faith."   The court emphasized that the City—precisely to avoid Establishment Clause problems—had declined to regulate the content of the prayers, requesting only that volunteers not use the opportunity to proselytize or disparage any one faith. Finally, the court concluded that their state constitutional claim failed for the same reasons.  Rubin and Feller timely appeal.

## II

Rubin and Feller argue that the district court wrongly concluded that both the April 27 invocation and the City's prayer practice withstood First Amendment scrutiny.[3]  We consider first the prayer and then the policy.

## A

Rubin and Feller urge us to declare Hearns's April 27 invocation (specifically, its reference to Jesus) unconstitutional and to reverse the district court's contrary conclusion. Relying principally on two Supreme Court cases, they contend that any explicit reference to a sectarian figure in legislative prayer is a per se breach of the Establishment Clause.

---

[3] Although Rubin and Feller arguably waived their challenge to the prayer policy below, the district court nonetheless ruled on it.  The issue of the policy's constitutionality is therefore before us.

## 1

Both sides rightly assume that this case falls within the ambit of *Marsh v. Chambers*, 463 U.S. 783 (1983). There, the Supreme Court considered whether the Nebraska Legislature's decades-old practice of opening each legislative day with a prayer delivered by a state-employed chaplain violated the Establishment Clause. Since 1965, Robert Palmer, a Presbyterian minister, had served as the Nebraska Legislature's official chaplain, a salaried position. Each day the legislature met, Palmer began with a prayer. Ernest Chambers, a member of the legislature, sued to enjoin that practice. *Marsh*, 463 U.S. at 784–85.

Although the Eighth Circuit had evaluated Nebraska's practice under the familiar three prongs of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), *see Marsh*, 463 U.S. at 786, the Supreme Court took a different approach, "swe[eping] away" prevailing Establishment Clause doctrine in favor of a history-based analysis.[4] *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1232 (10th Cir. 1998) (en banc). "The opening of sessions of legislative and other deliberative public bodies with prayer," the *Marsh* Court noted, "is deeply

---

[4] Since *Marsh*, legislative prayer has enjoyed a "sui generis status" in Establishment Clause jurisprudence. *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1231 (10th Cir. 1998) (en banc); *see also McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 n.10 (2005) ("Establishment Clause doctrine lacks the comfort of categorical absolutes. In special instances we have found good reason to hold governmental action legitimate where its manifest purpose was presumably religious. *See, e.g., Marsh v. Chambers* . . ."); *Card v. City of Everett*, 520 F.3d 1009, 1014 (9th Cir. 2008) ("*Marsh* . . . should be construed as carving out an exception to normal Establishment Clause jurisprudence due to the unique history of legislative prayer." (internal quotation marks omitted)).

embedded in the history and tradition of this country." 463 U.S. at 786.  The Continental Congress, no less, began each of its sessions with an invocation delivered by a paid chaplain.  Likewise, the First Congress, in one of its first official acts, arranged for daily chaplain-led prayer in both chambers.  Days later, "final agreement was reached on the language of the Bill of Rights."  *Id.* at 788.  "Clearly," the Court inferred, "the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment."  *Id.* at 789–90.  Furthermore, the "practice of opening sessions with prayer has continued without interruption ever since."  *Id.* at 789.  Given this history, there could be "no doubt" that legislative prayer was constitutional.  *Id.*

Having upheld legislative prayer in general, the *Marsh* Court next considered whether specific features of Nebraska's practice pushed it out of constitutional bounds. Chambers leveled three complaints: (1) that Nebraska had selected a representative of "only one denomination" for sixteen years, (2) that the chaplain was on the state payroll, and (3) that his prayers were offered "in the Judeo-Christian tradition."  *Id.* at 792–93.  All three objections flopped. Choosing "a clergyman of one denomination" did not "advance[] the beliefs" of his sect.  Nor did paying him.  *Id.* at 794 ("[R]enumeration is grounded in [the Framers'] historic practice.").  Nor, even, did the words of the prayers themselves: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief," the Court declared.  "That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer."  *Id.* at 794–95.

A cursory read of *Marsh* does not disclose whether all or only some of Palmer's prayers were "not of concern." In footnote 14 (the call for which follows the Court's description of the prayers as "Judeo-Christian"), the Court wrote,

> Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.

*Id.* at 793 n.14 (citations omitted); *see also Van Orden v. Perry*, 545 U.S. 677, 688 n.8 (2005) (plurality opinion) ("In *Marsh*, the prayers were often explicitly Christian, but the chaplain removed all references to Christ the year after the suit was filed."). Six years later, in *County of Allegheny v. ACLU*, the Court revisited that footnote. 492 U.S. 573 (1989). There, the Court weighed the constitutionality of a city's yearly public display of a Christmas crèche and a Hanukkah menorah. Resolving the case under *Lemon*, the Court had occasion to address *Marsh* only in response to one of the dissent's arguments:

> [I]n *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ."

*Id.* at 603 (internal citations omitted).  Rubin and Feller assert that this snippet from *Allegheny* both confirms that *Marsh* upholds only nonsectarian legislative invocations and establishes that a single sectarian reference in a legislative prayer goes too far.

**2**

Rubin and Feller misread *Marsh* and misapprehend the effect of *Allegheny*.  Footnote 14 notwithstanding, *Marsh* nowhere confines its review of Nebraska's practice solely to the short period in which Palmer delivered only nonsectarian prayers.[5]  Rather, the Court trained its analysis on Nebraska's practice *over time*.  *See, e.g.,* 463 U.S. at 790 (". . . Nebraska's practice of over a century, consistent with two centuries of national practice . . ."); *id.* at 795 ("The unbroken practice . . . for more than a century in Nebraska . . . gives abundant assurance that there is no real threat . . . .").  Indeed, when it took up Chambers's objection to the prayers' content, the Court concluded—in a tellingly worded sentence—that "there is no indication that the prayer opportunity *has been* exploited" to proselytize, advance, or disparage a religion. *Id.* at 794–95 (emphasis added).  That verb ("has been exploited") is in the present perfect tense, denoting "a time in the indefinite past" or "a past action that comes up to and touches the present." *See Chicago Manual of Style* 237 (16th ed. 2010).  Had the Court wished to avoid suggesting that Palmer's pre-1980 sectarian prayers had not advanced Christianity, it would have used either the simple past ("was

---

[5] "And it is not even clear that the removal of references to Christ rendered all post-1980 prayers nondenominational." *Galloway v. Town of Greece*, 681 F.3d 20, 30 (2d Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3336 (U.S. Dec. 6, 2012) (No. 12-696).

exploited") or past perfect ("had been exploited") with a qualifying clause or phrase (e.g., "there is no indication that, during or after 1980, the prayer opportunity [was / had been] exploited"). As written, the opinion leaves the impression that *none* of Palmer's controversial prayers, at least viewed cumulatively, crossed the line.

Both dissents in *Marsh* read the majority opinion as we do. Justice Brennan, for example, argued that the "controversy" surrounding the chaplain's "Christological references" evinced a threat of state "entanglement" with religion—a meaningless riposte to the majority if only Feller's nonsectarian prayers had been before the Court. *Marsh*, 463 U.S. at 799–800 & n.9 (Brennan, J., dissenting). Likewise, Justice Stevens faulted the majority for neglecting to scrutinize Palmer's overtly Christian supplications: "The Court declines to 'embark on a sensitive evaluation or to parse the content of a particular prayer.' Perhaps it does so because it would be unable to explain away the clearly sectarian content of some of the prayers given by Nebraska's chaplain." *Id.* at 823 & n.2 (Stevens, J., dissenting) (internal citations omitted) (citing a prayer of Palmer's from 1978 that spoke of "the suffering and death of [God's] son," "[t]he power of the cross," and "the wonder of Christ crucified"). Plainly, neither dissenting justice interpreted footnote 14 to leave for another day the constitutional status of single sectarian references in legislative prayers. *See also Van Orden*, 545 U.S. at 688 n.8 (plurality opinion) ("In *Marsh*, the prayers were often explicitly Christian . . . .").

**3**

What is more telling than *Marsh*'s language, however, is that the very "history and tradition" anchoring its holding

reveal a long-standing practice not only of legislative prayer generally but of *sectarian* legislative prayer specifically. For instance, the very first invocation before the Continental Congress concluded, "All this we ask in the name and through the merits of Jesus Christ." Rev. Jacob Duché, *First Prayer of the Continental Congress* (Sept. 7, 1774), Office of the Chaplain: U.S. House of Representatives, http://chaplain.house.gov/archive/continental.html. Similarly, Congress's first Thanksgiving Proclamation besought the colonial citizenry to "humble and earnest supplication that it may please God through the merits of Jesus Christ" to forgive and bless them. 9 *Journals of the Continental Congress, 1774–1789* 855 (Worthington Chauncey Ford ed., 1907). Again in 1800, to mark the death of George Washington, a legislative chaplain petitioned that all "may obtain unto the resurrection of life, through Jesus Christ our Lord; at whose second coming in glorious majesty to judge the world . . . those who sleep in him shall be . . . made like unto his own glorious body." Henry Lee III, *An Address and a Form of Prayer*, *in An American Prayer Book* 58–59 (Christopher L. Webber ed., 2008).

This practice of sectarian congressional prayer has persisted. *Cf. Marsh,* 463 U.S. at 790 (giving weight to legislative prayer as an "unbroken practice"). As one scholar reports, "from America's earliest days to the present times, the prayers delivered by [legislative] chaplains have been true sacral prayers, and many of them, true Christian prayers." Steven Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 Colum. L. Rev. 2083, 2104 (1996). For example, between 1990 and 1996, "over two hundred and fifty opening prayers delivered by congressional chaplains . . . included supplications to Jesus Christ." *Id.* at 2104 & n.118. And the tradition continues. *See, e.g., Newdow v. Bush*,

355 F. Supp. 2d 265, 285 n.23 (D.D.C. 2005) ("[T]he legislative prayers at the U.S. Congress are overtly sectarian.").

This evidence makes it even more difficult to read *Marsh* as categorically barring sectarian legislative invocations. Indeed, if "what matters under *Marsh* is whether the prayer to be offered fits within the genre of legislative invocational prayer that has become part of the fabric of our society," then surely, as a general matter, sectarian and nonsectarian legislative prayer stand on equal footing. *Simpson v. Chesterfield Cnty. Bd. of Sup'rs*, 404 F.3d 276, 282 (4th Cir. 2005) (quoting *Snyder*, 159 F.3d at 1233) (internal alterations and quotation marks omitted).

**4**

Nonetheless, Rubin and Feller insist that *Allegheny* dislodged *Marsh*. We disagree. First, though *Allegheny* commented on *Marsh*, it did not—because, in dicta, it *could* not—supplant *Marsh* or restrict its scope. *See Simpson*, 404 F.3d at 281 n.3 ("*Allegheny* concerned religious holiday displays, referencing *Marsh* to confirm that *Marsh* did not apply in that context."); *Joyner v. Forsyth Cnty.*, 653 F.3d 341, 360 (4th Cir. 2011) (Niemeyer, J., dissenting) ("*Allegheny*'s dicta . . . do not govern legislative prayer cases."), *cert. denied*, 132 S. Ct. 1097 (2012). In any event, *Allegheny* does not in fact say that a legislative prayer is constitutional only if nonsectarian. A legislative invocation stripped of any mention of Jesus, *Allegheny* suggests, would not have the "effect of affiliating the government with" religion, but that is not to say that an explicitly sectarian prayer necessarily would. *See Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1271–72 (11th Cir. 2008) ("*Allegheny* does

not require that legislative prayer conform to the [nonsectarian] model in *Marsh.  Allegheny* instead reiterates the lesson of *Marsh* that legislative prayers should not 'demonstrate a [government] preference for one particular sect or creed . . . .'").    Rather, so long as legislative prayer—whether sectarian or not—does not proselytize, advance, or disparage one religion (*Marsh*'s language) or affiliate government with a particular faith (*Allegheny*'s reiteration), it withstands scrutiny.  *Marsh*, 463 U.S. at 795.  Far from displacing *Marsh*, *Allegheny* merely illuminates its boundaries.

For these reasons, we join several of our sister circuits in concluding that neither *Marsh* nor *Allegheny* categorically forbids sectarian references in legislative prayer.[6]

**5**

Rubin and Feller argue that Hearns's April 27 prayer went too far.  "Bring our minds to know you," Hearns importuned that evening, "and in the precious, holy and righteous and matchless name of Jesus I pray this prayer."  As Rubin and

---

[6] *See Galloway*, 681 F.3d at 29 ("[*Allegheny*] does not mean that any *single* denominational prayer has the forbidden effect of affiliating the government with any one faith."); *Joyner*, 653 F.3d at 351 ("[C]ourts should not be in the business of policing [legislative] prayers for the occasional sectarian reference—that carries things too far."); *Pelphrey*, 547 F.3d at 1266 ("The taxpayers argue that the Establishment Clause permits only nonsectarian prayers for the meetings of the commissions, but we disagree.").  "To the extent that [other] circuit cases stand instead for the proposition that the Establishment Clause precludes all legislative invocations that are denominational in nature . . . we cannot agree." *Galloway*, 681 F.3d at 28 (citing *Hinrichs v. Bosma*, 440 F.3d 393, 399 (7th Cir. 2006) and *Stein v. Plainwell Cmty. Schs.*, 822 F.2d 1406, 1409 (6th Cir. 1987)).

Feller have made quite clear throughout this litigation, they object to Hearns's prayer simply because it "mention[s] the name of Jesus." "[T]he Plaintiffs," their brief says, "were upset and offended because Hearns mentioned the name of Jesus." The district court acknowledged as much in its disposition below: "Plaintiffs clarified at trial that they challenge . . . only the reference to Jesus." And again: "Plaintiffs have made clear that their contention that the April 27 invocation violates the Establishment Clause rests solely on the single reference to Jesus." Consequently, the district court concluded that, aside from Hearns's invocation of Jesus, "[p]laintiffs have presented no evidence or argument to suggest that the April 27" invocation proselytized, advanced, or disparaged any faith, nor have they "contended that it had this purpose or effect."

So encumbered, Rubin and Feller's challenge to the April 27 prayer collapses. *Marsh* "does not mean that any *single* denominational prayer has the forbidden effect of affiliating the government with any one faith." *Galloway*, 681 F.3d at 29. Therefore, the district court's refusal to declare Hearns's invocation unconstitutional was not error.

**B**

Rubin and Feller next challenge the district court's determination that the April 27 prayer viewed "in context"—what they call the invocation "policy in practice"— posed no First Amendment problem. They say that it was not just Hearns's invocation that caused them to sue, but "what preceded" it and "what has occurred since." The problem, they allege, is the "unwritten policy, practice and custom of the City of Lancaster" under which the

majority of city-council invocations have been Christian—and often explicitly so.[7]

## 1

Just as *Marsh* evaluated Nebraska's *practice* of legislative prayers (not Palmer's prayers individually), we now must determine whether the City's "prayer practice, viewed in its entirety," has "advance[d] a single religious sect." *Galloway*, 681 F.3d at 28; *see Pelphrey*, 547 F.3d at 1277–78. To resolve this question, two circuits have undertaken something like an observer-based "frequency" analysis, invalidating any legislative-prayer practice that, from the vantage point of the prayers' listeners, has resulted in too large a proportion of sectarian invocations from one particular religious group. Because the attendees "hear the prayers, not the policy," the Fourth Circuit has reasoned, "we cannot turn a blind eye to the practical effects of the invocations at issue." *Joyner*, 653 F.3d at 354. Adopting a similar approach, the Second Circuit has asked whether, given the predominance of one sect's prayers (among other factors), "the [government's] practice, viewed in its totality by an ordinary, reasonable observer, conveyed the view that [it] favored or disfavored certain religious beliefs." *Galloway*, 681 F.3d at 29.

We read *Marsh* to require a different inquiry. "In determining what it means to 'advance' one religion or faith over others, the touchstone of the analysis should be whether *the government* has placed its imprimatur, deliberately or by

---

[7] We assume without deciding (because the City makes no argument to the contrary) that the City's "policy in practice," as Rubin and Feller describe it, is an actionable "policy" or "custom" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

implication, on any one faith or religion." *Joyner*, 653 F.3d at 362 (Niemeyer, J., dissenting). Reviewing the First Amendment's ratification history, the *Marsh* Court acknowledged that, though some Framers had in fact opposed legislative prayer because of its possibly disquieting effect on listeners of "divided . . . religious sentiments," that concern "was met by Samuel Adams, who stated that 'he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country.'" *Marsh*, 463 U.S. at 791–92. That Adams's view ultimately prevailed confirmed for the *Marsh* Court that the Framers, on the whole, "did not consider opening prayers as . . . symbolically placing the government's official seal of approval on one religious view." *Id.* at 792 (internal quotation marks omitted). Of course, a state still could, through its policy or practice, intentionally affiliate itself with a particular sect, but the question whether it has, *Marsh* suggests, will not pivot on the practice's effect on the disapproving listener.[8] *See id.* (downplaying the significance of legislative prayer's effect on an observer who, as "an adult, [is] presumably not readily susceptible to religious indoctrination or peer pressure" (internal citations and

---

[8] Contrasting legislative prayer with prayer during a high-school graduation ceremony, the Court explained years later,

> Inherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh v. Chambers* . . . . The atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend.

*Lee v. Weisman*, 505 U.S. 577, 596–97 (1992).

quotation marks omitted)); *see also id.* at 798 (Brennan, J., dissenting) (bemoaning the majority's failure to conclude, under *Lemon*'s "primary effect" prong, that from the perspective of the listener, "invocations in Nebraska's legislative halls explicitly link religious belief and observance to the power and prestige of the State").

Bypassing the reasonable observer, the *Marsh* Court instead trained its analysis not only on history but on the *government's* actions. For instance, though the court of appeals had worried that Palmer's sixteen-year tenure had "the *effect* of giving preference" to Presbyterianism, the Court, "no more than Members of the Congresses of this century, [could] perceive any suggestion that choosing a clergyman of one denomination advances the beliefs" of his church. *Marsh*, 463 U.S. at 793 (emphasis added). "To the contrary, the evidence"—which went solely to the *government's* reasons for retaining Palmer—suggested merely "that Palmer was reappointed because his performance and personal qualities were acceptable to the body appointing him." *Id.* at 793; *see also id.* at 823 n.1 (Stevens, J., dissenting) ("[O]nce again, the Court makes the subjective motivation of legislators the decisive criterion for judging the constitutionality of a state legislative practice."). The majority was similarly unconcerned that Palmer was a paid employee of the state, for, regardless of whether remuneration signals endorsement, it "is grounded in historic practice." *Id.* at 794. Likewise, the Court shrugged off Chambers's objection to the prayers themselves, even though Palmer's many sectarian references—having actually "led to controversy [in the legislature] along religious lines"—at times might have struck listeners as too favorable to Christianity. *See id.* at 800 (Brennan, J., dissenting) (highlighting "a series of [such] instances" in the record). In

sum, whatever message Nebraska might have conveyed through its practice of selecting, paying, and retaining for sixteen years a Presbyterian chaplain who often delivered explicitly Christian invocations, the Supreme Court concluded that the legislature had not advanced Christianity.

To be sure, had *Marsh* applied *Lemon*, then the question whether Nebraska had advanced Christianity would have depended on the prayers' effects and the reasonable observer's perceptions. *See Lemon*, 403 U.S. at 612; *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring) (reading *Lemon*'s effect prong to forbid government action that communicates "a message of government endorsement" to the reasonable observer); *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 249–53 (1990) (plurality opinion) (treating *Lemon*'s second prong and the endorsement test as the same inquiry). And indeed, the Court might well have determined, as had the Eighth Circuit, that "[t]hose who have observed or participated in Nebraska's legislative process over the last sixteen years would have to conclude that the legislature has an official view on religion which is expressed by its minister and promoted with the use of state funds." *Chambers v. Marsh*, 675 F.2d 228, 235 (8th Cir. 1982), *rev'd*, 463 U.S. 783 (1983).[9] Instead, the Court left *Lemon* on the shelf, upholding Nebraska's practice solely on the basis of original intent, tradition, and the absence of evidence suggesting a

[9] *But see Lynch*, 465 U.S. at 692–93 (O'Connor, J., concurring) (because of its history, legislative prayer is "not understood as conveying government approval of particular religious beliefs"); *Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring) ("[T]he history and ubiquity of a practice . . .provides part of the context in which a reasonable observer evaluates whether a challenged government practice conveys a message of endorsement of religion." (internal quotation marks omitted)).

state-led effort to proselytize, advance, or disparage any one religion.

For these reasons, we conclude that the question in this case is not simply whether, given the frequency of Christian invocations, the reasonable observer of Lancaster's city-council meetings would infer favoritism toward Christianity. Rather, it is whether the City itself has taken steps to affiliate itself with Christianity.

**2**

Rubin and Feller argue that the City, through its prayer practice, has placed its "official seal of approval" on Christianity. *Marsh*, 463 U.S. at 792. Far from it. The City has instead taken every feasible precaution—short of the extra step (itself fraught with constitutional peril[10]) of requiring volunteers to refrain altogether from referencing sectarian figures—to ensure its own evenhandedness. First, it has codified a litany of neutrality-enforcing safeguards: No person attending a city-council meeting, including a city employee or official, is required to participate in any prayer. No volunteer is paid to pray. Neither the council nor the clerk may "engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered." Moreover, the clerk has never removed a congregation's name from the list of invitees or refused to include one. *Cf. Joyner*, 653 F.3d at 362–63 (Niemeyer, J., dissenting) ("It is undisputed that both the County's policy and its implementation treat religious leaders from all religions *identically*, and no congregation was excluded from the County list.").

---

[10] *See infra* Part II.B.4.

Second, the City has taken proactive measures to deliver on its promise of inclusivity. The clerk must "make every reasonable effort to ensure that a variety of eligible invocational speakers are scheduled" to pray, but "[i]n any event, no invocational speaker shall be scheduled to offer a prayer at consecutive meetings . . . or at more than three . . . meetings in any calendar year." *Cf. Pelphrey*, 547 F.3d at 1266 (prayer policies constitutional because they "allow volunteer leaders of different religions, on a rotating basis, to offer invocations with a variety of religious expressions," such as references to Allah, Muhammad, and Jesus, by far the figure most often mentioned). He is to invite every local religious group that he can find. And, as responses trickle in, he is to schedule appearances on "a first-come, first-serve[d] or other random basis." No city official has ever attempted to influence the clerk's scheduling decisions.

Third, the City has stressed, both to the public and to invited prayer-givers, the policy's nonsectarian aims. Designed to "acknowledge and express the city Council's respect for [Lancaster's] diversity of religious denominations and faiths," as well as to "solemnize proceedings" of the council, the policy states that it "is not intended, and shall not be implemented or construed in any way, to affiliate the City Council with, nor express . . . preference for, any faith or religious denomination." Hence, the invitation notes that "[t]his opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience." It also entreats volunteers to respect the sensitive nature of the forum: "To maintain a spirit of respect and ecumenism, the City Council requests only that the prayer opportunity not be exploited as an effort to convert others . . . nor to disparage any faith or belief different [from] that of the invocational speaker." Not only, then, has the City designed its policy to

heed *Marsh*'s strictures.  It also has asked its volunteers to do the same.

## 3

But none of this, Rubin and Feller insist, is enough.  Its facially neutral policy notwithstanding, the City has advanced Christianity *in effect* because, as it happens, most of the volunteers so far have been Christian and have given Christian invocations.[11]

This argument misconceives the focus of our inquiry. Whatever the content of the prayers or the denominations of the prayer-givers, the *City* chooses neither.  That most so far have been Christian is merely a function of local "demographics and the choices of the religious leaders who responded out of their own initiative to the [City's]

---

[11] In addition to their effects-based argument, Rubin and Feller also insinuate in passing that the mayor of Lancaster, Rex Parris, is at the center of a campaign to transform Lancaster into a miniature Christendom. They point to a speech that Parris made before a meeting of Christian ministers in 2010, in which he said, "[W]e are growing a Christian community, and we should not shy away from that."  According to the district court, Parris later testified "that he meant a 'community where we love our neighbors, that we take care of our neighbors, that we protect our neighbors.'  He further testified that this is his policy; it is not an official City policy."  Since then, Parris has recruited members of minority (non-Christian) sects to "sign up" for council invocations.  Otherwise, he has had no involvement in the prayer policy's administration.  For these reasons, the district court was right to downplay the significance of Parris's speech.

invitation."**[12]** *Joyner*, 653 F.3d at 363 (Niemeyer, J., dissenting). The City cannot control which religious congregations settle within its limits. Nor can it compel leaders of those congregations to accept its invitations.**[13]** Rubin and Feller attack the City for the "policy in practice," but they have the wrong target: the policy's authors are the citizens themselves. *Cf. id.* ("[Plaintiffs] overlook[] the real life fact that when Forsyth County calls for prayers from religious leaders under a neutral policy that is proactively inclusive, the prayers will reflect the religions of the religious leaders, not the preferences of the County.").

In other Establishment Clause contexts, the Supreme Court has stressed this element of private choice, holding time and time again that when a neutral government policy or program merely allows or enables private religious acts, those acts do not necessarily bear the state's imprimatur. In the school-vouchers case, for example, the Court explained that "where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause." *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002). This is because "[t]he *incidental advancement* of a religious mission, or the

---

**[12]** Here, as in *Joyner*, "there is no evidence to suggest that the [City] attempted to game the demographics . . . by manipulating the list of religious leaders to ensure that only Christian prayer would be offered." *Joynder*, 653 F.3d at 363 (Niemeyer, J., dissenting).

**[13]** Though it may encourage them to do so, as the mayor has done. According to the district court, Mayor Parris has "encourag[ed] 'a lot of religious leaders including Sikhs, Rabbis, and Muslims to sign up.'"

perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government." *Id.* (emphasis added). On this logic, the Court also has rejected a constitutional challenge to a state tax-deduction program covering education expenses even for religious private schools: "Where, as here, aid to parochial schools is available only as a result of decisions of individual parents no imprimatur of State approval can be deemed to have been conferred on any particular religion, or on religion generally." *Mueller v. Allen*, 463 U.S. 388, 399 (1983) (internal quotation marks and citation omitted). And again, resolving a challenge to a vocational-scholarship program, the Court noted that "[a]ny aid . . . that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients," emphasizing that the challenged "program is made available generally without regard to the sectarian–nonsectarian, or public–nonpublic nature of the institution benefited." *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 488 (1986). These and other cases confirm, at the very least, that "a significant factor in upholding governmental programs in the face of Establishment Clause attack is their *neutrality* towards religion." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001); *see also Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993) (religious messages communicated by a taxpayer-funded sign-language interpreter working in a parochial school did not bear the government's endorsement because the program neutrally provided access to large group of citizens regardless of religious views).

Focusing here "on [the policy's] neutrality and the principle of private choice, not on the number of" volunteers from a particular sect, *Zelman*, 536 U.S. at 652, we see

nothing in the record or in the prayer policy to indicate that the City has affiliated itself with Christianity.

**4**

To avoid even the appearance that the prayer "policy in practice" too closely aligns the City with Christianity, Rubin and Feller request a ban on "prayers in the name of Jesus Christ (or any other religious figure)."[14] Presumably, Rubin and Feller would have us order the City to review as a matter of course the text of every proposed prayer, approving for delivery only those drafts rid of all references to saints, disciples, prophets, deities, and the like.

That remedy comes with its own set of First Amendment infirmities. For one thing, it would assign to the government the task of coauthoring prayers, precisely what the Court in *Lee v. Weisman* declared unconstitutional. In *Lee*, a rabbi argued that the government crossed the line when it told him that his graduation-ceremony invocation "should be nonsectarian." *Lee*, 505 U.S. at 588. The Court agreed: "It is a cornerstone principle of our Establishment Clause jurisprudence that 'it is no part of the business of government to compose official prayers,'" or "direct[] and control[]" their content. *Id.* at 588 (quoting *Engel v. Vitale*, 370 U.S. 421, 425 (1962)). "A state-imposed requirement that all

---

[14] In truth, Rubin and Feller's requests for relief have been inconsistent. In the first paragraph of their complaint, they ask for declaratory and injunctive relief only from prayers "wherein the name of Jesus Christ is invoked." But at the end of the complaint, they ask the court to enjoin Lancaster from "condoning, allowing, and sponsoring religious prayers." The district court concluded that plaintiffs "challenge *only* the reference to Jesus." On appeal, plaintiffs now ask for an injunction against prayers mentioning Christ or any other "religious figure."

legislative prayers be nondenominational . . . begins to sound like the establishment of 'an official or civil religion,'" the Second Circuit has explained, and "[t]he problem with such civic religious statements lies, in part, in the danger that such efforts to secure religious 'neutrality' may produce 'a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious.'" *Galloway*, 681 F.3d at 29 (quoting *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring)). Consequently, "a government may not establish a vague theism as a state religion any more than it may establish a specific creed."[15] *Id.* at 29.

Second, the very act of deciding—as a matter of constitutional law, no less—who counts as a "religious figure" or what amounts to a "sectarian reference" not only embroils judges in precisely those intrareligious controversies that the Constitution requires us to avoid, but also imposes on us a task that we are incompetent to perform.[16] *See Lee*, 505 U.S. at 616–17 (Souter, J., concurring). Rubin and Feller ask us to forbid mention of Jesus, since he is clearly a religious figure. Ostensibly, the same is true of "Allah,"

---

[15] Here, adopting a "vague theism" as civic religion would also risk shutting out those religious leaders who, perhaps for doctrinal reasons, are disinclined to restyle or dilute their prayers. *See* Robert J. Delahunty, *"Varied Carols": Legislative Prayer in a Pluralist Polity*, 40 Creighton L. Rev. 517, 526–27 (2007) ("Faced with the choice of praying in conformity with a government-imposed standard of orthodoxy or not praying at all, many clergy (to their credit) will choose not to pray at all.").

[16] It also may be that the task is simply impossible. *See* Geoffrey R. Stone, *In Opposition to the School Prayer Amendment*, 50 U. Chi. L. Rev. 823, 829 (1983) (arguing that "the very concept of a 'nondenominational prayer' is self-contradictory").

"Muhammad," or "Buddha." But do more generic religious appellations also cross the line? "Heavenly Father" strikes some as comfortably ecumenical, *see, e.g., Simpson*, 404 F.3d at 284, yet several sects reject the "fatherhood of God," *see generally, e.g.*, Elizabeth A. Johnson, *She Who Is: The Mystery of God in Feminist Theological Discourse* (2002), and some reject even the idea of a heavenly deity, *see generally, e.g.*, Paul Harrison, *Elements of Pantheism: Religious Reverence of Nature and the Universe* (2004). Other seemingly "safe" Judeo-Christian monikers, such as "Lord," "Jehovah," "Abraham," and "Moses," are no less problematic. *See Joyner*, 653 F.3d at 364 (Niemeyer, J., dissenting) ("[A]dherents to the Hindu or Muslim religions could assert that they are offended by prayers in the Judeo-Christian tradition, which the majority has deemed to be nonsectarian and nonoffensive."). Even within the Judeo-Christian tradition, some deific titles that seem ecumenical turn out not to be. *See id.* ("[I]n *Simpson*, we labeled as nonsectarian references to 'Lord of [l]ords,' and "King of [k]ings.' . . . Yet, those phrases refer to Jesus in the New Testament. *See* Revelations, 19:15."). As these few examples show, "[s]imply by requiring the enquiry, nonpreferentialists invite the courts to engage in comparative theology." *Lee*, 505 U.S. at 616–17 (Souter, J., concurring). We "can hardly imagine a subject less amenable to the competence of the federal judiciary, or more deliberately to be avoided where possible."[17] *Id.* Thus, we avoid it here.

---

[17] The Eleventh Circuit admitted in *Pelphrey* that it "would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions." 547 F.3d at 1272. There, as here, the plaintiffs offered little guidance:

> Even the individual taxpayers cannot agree on which expressions are "sectarian." Bats, one of the taxpayers,

## III

Rubin and Feller also claim that Hearns's invocation and the City's prayer practice violate Article 1, Section 4 of the California Constitution, which, in relevant part, mimics the Establishment Clause. *See* Cal. Const. art. 1, § 4. This "protection against the establishment of religion embedded in the California Constitution [does not] create[] broader protections than those of the First Amendment," given that "the California concept of a 'law respecting an establishment of religion' coincides with the intent and purpose of the First Amendment establishment clause." *E. Bay Asian Local Dev. Corp. v. California*, 13 P.3d 1122, 1138 (Cal. 2000) (internal citation omitted). Therefore, for the same reasons that Rubin and Feller's First Amendment claim fails, their state claim fails as well.

---

testified that a prohibition of "sectarian" references would preclude the use of "father," "Allah," and "Zoraster" but would allow "God" and "Jehovah." Selman, another taxpayer, testified, "[Y]ou can't say Jesus, . . . Jehovah, . . . [or] Wicca . . . ." Selman also deemed "lord or father" impermissible.

The taxpayers' counsel fared no better than his clients in providing a consistent and workable definition of sectarian expressions. In the district court, counsel for the taxpayers deemed "Heavenly Father" and "Lord" nonsectarian, even though his clients testified to the contrary. . . . When asked . . . whether "King of kings" was sectarian, he replied, "King of kings may be a tough one . . . . It is arguably a reference to one God . . . . I think it is safe to conclude that it might not be sectarian."

*Id.*

## IV

The district court correctly determined that neither Hearns's April 27 invocation nor the City's prayer policy constituted an unconstitutional establishment of religion.

**AFFIRMED**.