Justice BREYER, dissenting.
As we all recognize, this is a "fact-sensitive" case. Ante, at 1825 (opinion of KENNEDY, J.); see also post, at 1851 - 1852 (KAGAN, J., dissenting); 681 F.3d 20, 34 (C.A.2 2012) (explaining that the Court of Appeals' holding follows from the "totality of the circumstances"). The Court of Appeals did not believe that the Constitution *1839 forbids legislative prayers that incorporate content associated with a particular denomination. Id., at 28. Rather, the court's holding took that content into account simply because it indicated that the town had not followed a sufficiently inclusive "prayer-giver selection process." Id., at 30. It also took into account related "actions (and inactions) of prayer-givers and town officials." Ibid. Those actions and inactions included (1) a selection process *611 that led to the selection of "clergy almost exclusively from places of worship located within the town's borders," despite the likelihood that significant numbers of town residents were members of congregations that gather just outside those borders; (2) a failure to "infor[m] members of the general public that volunteers" would be acceptable prayer givers; and (3) a failure to "infor[m] prayer-givers that invocations were not to be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker." Id., at 31-32 (internal quotation marks omitted).
The Court of Appeals further emphasized what it was not holding. It did not hold that "the town may not open its public meetings with a prayer," or that "any prayers offered in this context must be blandly 'nonsectarian.' " Id., at 33. In essence, the Court of Appeals merely held that the town must do more than it had previously done to try to make its prayer practices inclusive of other faiths. And it did not prescribe a single constitutionally required method for doing so.
In my view, the Court of Appeals' conclusion and its reasoning are convincing. Justice KAGAN's dissent is consistent with that view, and I join it. I also here emphasize several factors that I believe underlie the conclusion that, on the particular facts of this case, the town's prayer practice violated the Establishment Clause.
First, Greece is a predominantly Christian town, but it is not exclusively so. A map of the town's houses of worship introduced in the District Court shows many Christian churches within the town's limits. It also shows a Buddhist temple within the town and several Jewish synagogues just outside its borders, in the adjacent city of Rochester, New York. Id., at 24. Yet during the more than 120 monthly meetings at which prayers were delivered during the record period (from 1999 to 2010), only four prayers were delivered *612 by non-Christians. And all of these occurred in 2008, shortly after the plaintiffs began complaining about the town's Christian prayer practice and nearly a decade after that practice had commenced. See post, at 1848, 1852.
To be precise: During 2008, two prayers were delivered by a Jewish layman, one by the chairman of a Baha'i congregation, and one by a Wiccan priestess. The Jewish and Wiccan prayer givers were invited only after they reached out to the town to inquire about giving an invocation. The town apparently invited the Baha'i chairman on its own initiative. The inclusivity of the 2008 meetings, which contrasts starkly with the exclusively single-denomination prayers every year before and after, is commendable. But the Court of Appeals reasonably decided not to give controlling weight to that inclusivity, for it arose only in response to the complaints that presaged this litigation, and it did not continue into the following years.
Second, the town made no significant effort to inform the area's non-Christian houses of worship about the possibility of delivering an opening prayer. See post, at 1852. Beginning in 1999, when it instituted its practice of opening its monthly board meetings with prayer, Greece selected *1840 prayer givers as follows: Initially, the town's employees invited clergy from each religious organization listed in a "Community Guide" published by the Greece Chamber of Commerce. After that, the town kept a list of clergy who had accepted invitations and reinvited those clergy to give prayers at future meetings. From time to time, the town supplemented this list in response to requests from citizens and to new additions to the Community Guide and a town newspaper called the Greece Post.
The plaintiffs do not argue that the town intentionally discriminated against non- Christians when choosing whom to invite, 681 F.3d, at 26, and the town claims, plausibly, that it would have allowed anyone who asked to give an invocation *613 to do so. Rather, the evident reasons why the town consistently chose Christian prayer givers are that the Buddhist and Jewish temples mentioned above were not listed in the Community Guide or the Greece Post and that the town limited its list of clergy almost exclusively to representatives of houses of worship situated within Greece's town limits (again, the Buddhist temple on the map was within those limits, but the synagogues were just outside them). Id., at 24, 31.
Third, in this context, the fact that nearly all of the prayers given reflected a single denomination takes on significance. That significance would have been the same had all the prayers been Jewish, or Hindu, or Buddhist, or of any other denomination. The significance is that, in a context where religious minorities exist and where more could easily have been done to include their participation, the town chose to do nothing. It could, for example, have posted its policy of permitting anyone to give an invocation on its website, greeceny.gov, which provides dates and times of upcoming town board meetings along with minutes of prior meetings. It could have announced inclusive policies at the beginning of its board meetings, just before introducing the month's prayer giver. It could have provided information to those houses of worship of all faiths that lie just outside its borders and include citizens of Greece among their members. Given that the town could easily have made these or similar efforts but chose not to, the fact that all of the prayers (aside from the 2008 outliers) were given by adherents of a single religion reflects a lack of effort to include others. And that is what I take to be a major point of Justice KAGAN's related discussion. See post, at 1841 - 1843, 1845 - 1846, 1848 - 1849, 1852 - 1853.
Fourth, the fact that the board meeting audience included citizens with business to conduct also contributes to the importance of making more of an effort to include members of other denominations. It does not, however, automatically *614 change the nature of the meeting from one where an opening prayer is permissible under the Establishment Clause to one where it is not. Cf. post, at 1845 - 1848, 1849 - 1850, 1851 - 1852.
Fifth, it is not normally government's place to rewrite, to parse, or to critique the language of particular prayers. And it is always possible that members of one religious group will find that prayers of other groups (or perhaps even a moment of silence) are not compatible with their faith. Despite this risk, the Constitution does not forbid opening prayers. But neither does the Constitution forbid efforts to explain to those who give the prayers the nature of the occasion and the audience.
The U.S. House of Representatives, for example, provides its guest chaplains with the following guidelines, which are designed to encourage the sorts of prayer that are consistent with the purpose of an *1841 invocation for a government body in a religiously pluralistic Nation:
"The guest chaplain should keep in mind that the House of Representatives is comprised of Members of many different faith traditions.
"The length of the prayer should not exceed 150 words.
"The prayer must be free from personal political views or partisan politics, from sectarian controversies, and from any intimations pertaining to foreign or domestic policy." App. to Brief for Respondents 2a.
The town made no effort to promote a similarly inclusive prayer practice here. See post, at 1852 - 1853.
As both the Court and Justice KAGAN point out, we are a Nation of many religions. Ante, at 1820 - 1821; post, at 1841 - 1842, 1850 - 1851. And the Constitution's Religion Clauses seek to "protec[t] the Nation's social fabric from religious conflict." Zelman v. Simmons-Harris, 536 U.S. 639, 717, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (BREYER, J., dissenting). The question in this case is whether the prayer practice of the town of Greece, by doing too little to reflect the religious diversity of its citizens, did *615 too much, even if unintentionally, to promote the "political division along religious lines" that "was one of the principal evils against which the First Amendment was intended to protect." Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
In seeking an answer to that fact-sensitive question, "I see no test-related substitute for the exercise of legal judgment." Van Orden v. Perry, 545 U.S. 677, 700, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment). Having applied my legal judgment to the relevant facts, I conclude, like Justice KAGAN, that the town of Greece failed to make reasonable efforts to include prayer givers of minority faiths, with the result that, although it is a community of several faiths, its prayer givers were almost exclusively persons of a single faith. Under these circumstances, I would affirm the judgment of the Court of Appeals that Greece's prayer practice violated the Establishment Clause.
I dissent from the Court's decision to the contrary.
Justice KAGAN, with whom Justice GINSBURG, Justice BREYER, and Justice SOTOMAYOR join, dissenting.
For centuries now, people have come to this country from every corner of the world to share in the blessing of religious freedom. Our Constitution promises that they may worship in their own way, without fear of penalty or danger, and that in itself is a momentous offering. Yet our Constitution makes a commitment still more remarkable-that however those individuals worship, they will count as full and equal American citizens. A Christian, a Jew, a Muslim (and so forth)-each stands in the same relationship with her country, with her state and local communities, and with every level and body of government. So that when each person performs the duties or seeks the benefits of citizenship, she does so not as an adherent to one or another religion, but simply as an American.
I respectfully dissent from the Court's opinion because I think the Town of Greece's prayer practices violate that *616 norm of religious equality-the breathtakingly generous constitutional idea that our public institutions belong no less to the Buddhist or Hindu than to the Methodist or Episcopalian. I do not contend that principle translates here into a bright separationist line. To the contrary, I agree with the Court's decision in Marsh v. *1842 Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), upholding the Nebraska Legislature's tradition of beginning each session with a chaplain's prayer. And I believe that pluralism and inclusion in a town hall can satisfy the constitutional requirement of neutrality; such a forum need not become a religion-free zone. But still, the Town of Greece should lose this case. The practice at issue here differs from the one sustained in Marsh because Greece's town meetings involve participation by ordinary citizens, and the invocations given-directly to those citizens-were predominantly sectarian in content. Still more, Greece's Board did nothing to recognize religious diversity: In arranging for clergy members to open each meeting, the Town never sought (except briefly when this suit was filed) to involve, accommodate, or in any way reach out to adherents of non-Christian religions. So month in and month out for over a decade, prayers steeped in only one faith, addressed toward members of the public, commenced meetings to discuss local affairs and distribute government benefits. In my view, that practice does not square with the First Amendment's promise that every citizen, irrespective of her religion, owns an equal share in her government.
I
To begin to see what has gone wrong in the Town of Greece, consider several hypothetical scenarios in which sectarian prayer-taken straight from this case's record-infuses governmental activities. None involves, as this case does, a proceeding that could be characterized as a legislative session, but they are useful to elaborate some general principles. In each instance, assume (as was true in Greece) that the invocation is given pursuant to government policy *617 and is representative of the prayers generally offered in the designated setting:
• You are a party in a case going to trial; let's say you have filed suit against the government for violating one of your legal rights. The judge bangs his gavel to call the court to order, asks a minister to come to the front of the room, and instructs the 10 or so individuals present to rise for an opening prayer. The clergyman faces those in attendance and says: "Lord, God of all creation,.... We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength ... from his resurrection at Easter. Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life. Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side.... Amen." App. 88a-89a. The judge then asks your lawyer to begin the trial.
• It's election day, and you head over to your local polling place to vote. As you and others wait to give your names and receive your ballots, an election official asks everyone there to join him in prayer. He says: "We pray this [day] for the guidance of the Holy Spirit as [we vote].... Let's just say the Our Father together. 'Our Father, who art in Heaven, hallowed be thy name; thy Kingdom come, thy will be done, on earth as it is in Heaven....' " Id., at 56a. And after he concludes, he makes the sign of the cross, and appears to wait expectantly for you and the other prospective voters to do so too.
• You are an immigrant attending a naturalization ceremony to finally become a citizen. The presiding official tells you and your fellow applicants that before administering the oath of allegiance, he would like a minister to *1843 pray for you and with you. The pastor steps to the front of the room, asks everyone to bow their heads, and recites: "[F]ather, son, and Holy Spirit-it is with a due *618 sense of reverence and awe that we come before you [today] seeking your blessing.... You are ... a wise God, oh Lord, ... as evidenced even in the plan of redemption that is fulfilled in Jesus Christ. We ask that you would give freely and abundantly wisdom to one and to all ... in the name of the Lord and Savior Jesus Christ, who lives with you and the Holy Spirit, one God for ever and ever. Amen." Id., at 99a-100a.
I would hold that the government officials responsible for the above practices-that is, for prayer repeatedly invoking a single religion's beliefs in these settings-crossed a constitutional line. I have every confidence the Court would agree. See ante, at 1834 (ALITO, J., concurring). And even Greece's attorney conceded that something like the first hypothetical (he was not asked about the others) would violate the First Amendment. See Tr. of Oral Arg. 3-4. Why?
The reason, of course, has nothing to do with Christianity as such. This opinion is full of Christian prayers, because those were the only invocations offered in the Town of Greece. But if my hypotheticals involved the prayer of some other religion, the outcome would be exactly the same. Suppose, for example, that government officials in a predominantly Jewish community asked a rabbi to begin all public functions with a chanting of the Sh'ma and V'ahavta. ("Hear O Israel! The Lord our God, the Lord is One.... Bind [these words] as a sign upon your hand; let them be a symbol before your eyes; inscribe them on the doorposts of your house, and on your gates.") Or assume officials in a mostly Muslim town requested a muezzin to commence such functions, over and over again, with a recitation of the Adhan. ("God is greatest, God is greatest. I bear witness that there is no deity but God. I bear witness that Muhammed is the Messenger of God.") In any instance, the question would be why such government-sponsored prayer of a single religion goes beyond the constitutional pale.
*619 One glaring problem is that the government in all these hypotheticals has aligned itself with, and placed its imprimatur on, a particular religious creed. "The clearest command of the Establishment Clause," this Court has held, "is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Justices have often differed about a further issue: whether and how the Clause applies to governmental policies favoring religion (of all kinds) over non-religion. Compare, e.g., McCreary County v. American Civil Liberties Union of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) ("[T]he First Amendment mandates governmental neutrality between ... religion and nonreligion"), with, e.g., id., at 885, 125 S.Ct. 2722 (SCALIA, J., dissenting) ("[T]he Court's oft repeated assertion that the government cannot favor religious practice [generally] is false"). But no one has disagreed with this much:
"[O]ur constitutional tradition, from the Declaration of Independence and the first inaugural address of Washington ... down to the present day, has ... ruled out of order government-sponsored endorsement of religion ... where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ)."
*1844 Lee v. Weisman, 505 U.S. 577, 641 [112 S.Ct. 2649, 120 L.Ed.2d 467] (1992) (SCALIA, J., dissenting).
See also County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U.S. 573, 605, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ( "Whatever else the Establishment Clause may mean[,] ... [it] means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)").[1] By *620 authorizing and overseeing prayers associated with a single religion-to the exclusion of all others-the government officials in my hypothetical cases (whether federal, state, or local does not matter) have violated that foundational principle. They have embarked on a course of religious favoritism anathema to the First Amendment.
And making matters still worse: They have done so in a place where individuals come to interact with, and participate in, the institutions and processes of their government. A person goes to court, to the polls, to a naturalization ceremony-and a government official or his hand-picked minister asks her, as the first order of official business, to stand and pray with others in a way conflicting with her own religious beliefs. Perhaps she feels sufficient pressure to go along-to rise, bow her head, and join in whatever others are saying: After all, she wants, very badly, what the judge or poll worker or immigration official has to offer. Or perhaps she *621 is made of stronger mettle, and she opts not to participate in what she does not believe-indeed, what would, for her, be something like blasphemy. She then must make known her dissent from the common religious view, and place herself apart from other citizens, as well as from the officials responsible for the invocations. And so a civic function of some kind brings religious differences to the fore: That public proceeding becomes (whether intentionally or not) an instrument for dividing her from adherents to the community's majority religion, and for altering the very nature of her relationship with her government.
That is not the country we are, because that is not what our Constitution permits. Here, when a citizen stands before her government, whether to perform a service or request a benefit, her religious beliefs *1845 do not enter into the picture. See Thomas Jefferson, Virginia Act for Establishing Religious Freedom (Oct. 31, 1785), in 5 The Founders' Constitution 85 (P. Kurland & R. Lerner eds. 1987) ("[O]pinion[s] in matters of religion ... shall in no wise diminish, enlarge, or affect [our] civil capacities"). The government she faces favors no particular religion, either by word or by deed. And that government, in its various processes and proceedings, imposes no religious tests on its citizens, sorts none of them by faith, and permits no exclusion based on belief. When a person goes to court, a polling place, or an immigration proceeding-I could go on: to a zoning agency, a parole board hearing, or the DMV-government officials do not engage in sectarian worship, nor do they ask her to do likewise. They all participate in the business of government not as Christians, Jews, Muslims (and more), but only as Americans-none of them different from any other for that civic purpose. Why not, then, at a town meeting?
II
In both Greece's and the majority's view, everything I have discussed is irrelevant here because this case involves *622 "the tradition of legislative prayer outlined" in Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330.Ante, at 1820 - 1821. And before I dispute the Town and Court, I want to give them their due: They are right that, under Marsh, legislative prayer has a distinctive constitutional warrant by virtue of tradition. As the Court today describes, a long history, stretching back to the first session of Congress (when chaplains began to give prayers in both Chambers), "ha[s] shown that prayer in this limited context could 'coexis[t] with the principles of disestablishment and religious freedom.' " Ante, at 1820 (quoting Marsh, 463 U.S., at 786, 103 S.Ct. 3330). Relying on that "unbroken" national tradition, Marsh upheld (I think correctly) the Nebraska Legislature's practice of opening each day with a chaplain's prayer as "a tolerable acknowledgment of beliefs widely held among the people of this country." Id., at 792, 103 S.Ct. 3330. And so I agree with the majority that the issue here is "whether the prayer practice in the Town of Greece fits within the tradition long followed in Congress and the state legislatures." Ante, at 1819.
Where I depart from the majority is in my reply to that question. The town hall here is a kind of hybrid. Greece's Board indeed has legislative functions, as Congress and state assemblies do-and that means some opening prayers are allowed there. But much as in my hypotheticals, the Board's meetings are also occasions for ordinary citizens to engage with and petition their government, often on highly individualized matters. That feature calls for Board members to exercise special care to ensure that the prayers offered are inclusive-that they respect each and every member of the community as an equal citizen.[2] But the Board, *623 and the clergy members it selected, made no such effort. Instead, the prayers given in Greece, addressed directly to the Town's citizenry, were more sectarian, and less inclusive, than anything this Court sustained in Marsh . For those reasons, the prayer in *1846 Greece departs from the legislative tradition that the majority takes as its benchmark.
A
Start by comparing two pictures, drawn precisely from reality. The first is of Nebraska's (unicameral) Legislature, as this Court and the state senators themselves described it. The second is of town council meetings in Greece, as revealed in this case's record.
It is morning in Nebraska, and senators are beginning to gather in the State's legislative chamber: It is the beginning of the official workday, although senators may not yet need to be on the floor. See Chambers v. Marsh, 504 F.Supp. 585, 590, and n. 12 (D.Neb.1980) ; Lee, 505 U.S., at 597, 112 S.Ct. 2649. The chaplain rises to give the daily invocation. That prayer, as the senators emphasized when their case came to this Court, is "directed only at the legislative membership, not at the public at large." Brief for Petitioners in Marsh 30. Any members of the public who happen to be in attendance-not very many at this early hour-watch only from the upstairs visitors' gallery. See App. 72 in Marsh (senator's testimony that "as a practical matter the public usually is not there" during the prayer).
The longtime chaplain says something like the following (the excerpt is from his own amicus brief supporting Greece in this case): "O God, who has given all persons talents and varying capacities, Thou dost only require of us that we utilize Thy gifts to a maximum. In this Legislature to which Thou has entrusted special abilities and opportunities, may each recognize his stewardship for the people of the State." Brief for Robert E. Palmer 9. The chaplain is a Presbyterian minister, and "some of his earlier prayers" explicitly invoked Christian beliefs, but he "removed all references to *624 Christ" after a single legislator complained. Marsh, 463 U.S., at 793, n. 14, 103 S.Ct. 3330; Brief for Petitioners in Marsh 12. The chaplain also previously invited other clergy members to give the invocation, including local rabbis. See ibid.
Now change the channel: It is evening in Greece, New York, and the Supervisor of the Town Board calls its monthly public meeting to order. Those meetings (so says the Board itself) are "the most important part of Town government." See Town of Greece, Town Board, online at http://greeceny. gov/planning/townboard (as visited May 2, 2014 and available in Clerk of Court's case file). They serve assorted functions, almost all actively involving members of the public. The Board may swear in new Town employees and hand out awards for civic accomplishments; it always provides an opportunity (called a Public Forum) for citizens to address local issues and ask for improved services or new policies (for example, better accommodations for the disabled or actions to ameliorate traffic congestion, see Pl. Exhs. 718, 755, in No. 6:08-cv-6088 (WDNY)); and it usually hears debate on individual applications from residents and local businesses to obtain special land-use permits, zoning variances, or other licenses.
The Town Supervisor, Town Clerk, Chief of Police, and four Board members sit at the front of the meeting room on a raised dais. But the setting is intimate: There are likely to be only 10 or so citizens in attendance. A few may be children or teenagers, present to receive an award or fulfill a high school civics requirement.
As the first order of business, the Town Supervisor introduces a local Christian clergy member-denominated the chaplain of the month-to lead the assembled persons in prayer. The pastor steps up to a lectern (emblazoned with the Town's seal)
*1847 at the front of the dais, and with his back to the Town officials, he faces the citizens present. He asks them all to stand and to "pray as we begin this evening's *625 town meeting." App. 134a. (He does not suggest that anyone should feel free not to participate.) And he says:
"The beauties of spring ... are an expressive symbol of the new life of the risen Christ. The Holy Spirit was sent to the apostles at Pentecost so that they would be courageous witnesses of the Good News to different regions of the Mediterranean world and beyond. The Holy Spirit continues to be the inspiration and the source of strength and virtue, which we all need in the world of today. And so ... [w]e pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets." Ibid.
After the pastor concludes, Town officials behind him make the sign of the cross, as do some members of the audience, and everyone says " Amen." See 681 F.3d 20, 24 (C.A.2 2012). The Supervisor then announces the start of the Public Forum, and a citizen stands up to complain about the Town's contract with a cable company. See App. in No. 10-3635 (CA2), p. A574.
B
Let's count the ways in which these pictures diverge. First, the governmental proceedings at which the prayers occur differ significantly in nature and purpose. The Nebraska Legislature's floor sessions-like those of the U.S. Congress and other state assemblies-are of, by, and for elected lawmakers. Members of the public take no part in those proceedings; any few who attend are spectators only, watching from a high-up visitors' gallery. (In that respect, note that neither the Nebraska Legislature nor the Congress calls for prayer when citizens themselves participate in a hearing-say, by giving testimony relevant to a bill or nomination.) Greece's town meetings, by contrast, revolve around ordinary members of the community. Each and every aspect of those sessions provides opportunities for *626 Town residents to interact with public officials. And the most important parts enable those citizens to petition their government. In the Public Forum, they urge (or oppose) changes in the Board's policies and priorities; and then, in what are essentially adjudicatory hearings, they request the Board to grant (or deny) applications for various permits, licenses, and zoning variances. So the meetings, both by design and in operation, allow citizens to actively participate in the Town's governance-sharing concerns, airing grievances, and both shaping the community's policies and seeking their benefits.
Second (and following from what I just said), the prayers in these two settings have different audiences. In the Nebraska Legislature, the chaplain spoke to, and only to, the elected representatives. Nebraska's senators were adamant on that point in briefing Marsh, and the facts fully supported them: As the senators stated, "[t]he activity is a matter of internal daily procedure directed only at the legislative membership, not at [members of] the public." Brief for Petitioners in Marsh 30; see Reply Brief for Petitioners in Marsh 8 ("The [prayer] practice involves no function or power of government vis-à-vis the Nebraska citizenry, but merely concerns an internal decision of the Nebraska Legislature as to the daily procedure by which it conducts its own affairs"). The same is true in the U.S. Congress and, I suspect, in every other state legislature. See Brief for Members of Congress as Amici Curiae 6 ("Consistent with the fact that attending citizens are mere passive observers, prayers in the House are delivered for the Representatives themselves, not those citizens"
*1848 ). As several Justices later noted (and the majority today agrees, see ante, at 1825 - 1826),[3] Marsh involved "government officials invok[ing] spiritual inspiration *627 entirely for their own benefit without directing any religious message at the citizens they lead." Lee, 505 U.S., at 630, n. 8, 112 S.Ct. 2649 (Souter, J., concurring).
The very opposite is true in Greece: Contrary to the majority's characterization, see ante, at 1825 - 1826, the prayers there are directed squarely at the citizens. Remember that the chaplain of the month stands with his back to the Town Board; his real audience is the group he is facing-the 10 or so members of the public, perhaps including children. See supra, at 1846. And he typically addresses those people, as even the majority observes, as though he is "directing [his] congregation." Ante, at 1826. He almost always begins with some version of "Let us all pray together." See, e.g., App. 75a, 93a, 106a, 109a. Often, he calls on everyone to stand and bow their heads, and he may ask them to recite a common prayer with him. See, e.g., id., at 28a, 42a, 43a, 56a, 77a. He refers, constantly, to a collective "we"-to "our" savior, for example, to the presence of the Holy Spirit in "our" lives, or to "our brother the Lord Jesus Christ." See, e.g., id., at 32a, 45a, 47a, 69a, 71a. In essence, the chaplain leads, as the first part of a town meeting, a highly intimate (albeit relatively brief) prayer service, with the public serving as his congregation.
And third, the prayers themselves differ in their content and character. Marsh characterized the prayers in the Nebraska Legislature as "in the Judeo-Christian tradition," and stated, as a relevant (even if not dispositive) part of its analysis, that the chaplain had removed all explicitly Christian references at a senator's request. 463 U.S., at 793, n. 14, 103 S.Ct. 3330. And as the majority acknowledges, see ante, at 1821 - 1822, Marsh hinged on the view that "that the prayer opportunity ha[d] [not] been exploited to proselytize or advance any one ... faith or belief"; had it been otherwise, the Court would have reached a different decision. 463 U.S., at 794-795, 103 S.Ct. 3330.
But no one can fairly read the prayers from Greece's Town meetings as anything other than explicitly Christian-constantly *628 and exclusively so. From the time Greece established its prayer practice in 1999 until litigation loomed nine years later, all of its monthly chaplains were Christian clergy. And after a brief spell surrounding the filing of this suit (when a Jewish layman, a Wiccan priestess, and a Baha'i minister appeared at meetings), the Town resumed its practice of inviting only clergy from neighboring Protestant and Catholic churches. See App. 129a-143a. About two-thirds of the prayers given over this decade or so invoked "Jesus," "Christ," "Your Son," or "the Holy Spirit"; in the 18 months before the record closed, 85% included those references. See generally id., at 27a-143a. Many prayers contained elaborations of Christian doctrine or recitations of scripture. See, e.g., id., at 129a ("And in the life and death, resurrection and ascension of the Savior Jesus Christ, the full extent of your kindness shown to the unworthy is forever demonstrated"); id., at 94a ("For unto us a child is born; unto us a son is given. And the government shall be upon his shoulder ..."). And the prayers usually close with phrases like "in the name of Jesus Christ" or " in the name of Your son." See, e.g., id., at 55a, 65a, 73a, 85a. *1849 Still more, the prayers betray no understanding that the American community is today, as it long has been, a rich mosaic of religious faiths. See Braunfeld v. Brown, 366 U.S. 599, 606, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion) (recognizing even half a century ago that "we are a cosmopolitan nation made up of people of almost every conceivable religious preference"). The monthly chaplains appear almost always to assume that everyone in the room is Christian (and of a kind who has no objection to government-sponsored worship[4] ). The Town *629 itself has never urged its chaplains to reach out to members of other faiths, or even to recall that they might be present. And accordingly, few chaplains have made any effort to be inclusive; none has thought even to assure attending members of the public that they need not participate in the prayer session. Indeed, as the majority forthrightly recognizes, see ante, at 1824, when the plaintiffs here began to voice concern over prayers that excluded some Town residents, one pastor pointedly thanked the Board "[o]n behalf of all God-fearing people" for holding fast, and another declared the objectors "in the minority and ... ignorant of the history of our country." App. 137a, 108a.
C
Those three differences, taken together, remove this case from the protective ambit of Marsh and the history on which it relied. To recap: Marsh upheld prayer addressed to legislators alone, in a proceeding in which citizens had no role-and even then, only when it did not "proselytize or advance" any single religion. 463 U.S., at 794, 103 S.Ct. 3330. It was that legislative prayer practice (not every prayer in a body exercising any legislative function) that the Court found constitutional given its "unambiguous and unbroken history." Id., at 792, 103 S.Ct. 3330. But that approved practice, as I have shown, is not Greece's. None of the history Marsh cited-and none the majority details today-supports calling on citizens to pray, in a manner consonant with only a single religion's beliefs, at a participatory public proceeding, having both legislative and adjudicative components. Or to use the majority's phrase, no "history shows that th[is] specific practice is permitted." Ante, at 1819. And so, contra the majority, Greece's prayers cannot simply ride on the constitutional coattails of the legislative tradition Marsh described. The Board's practice must, in its own particulars, meet constitutional requirements.
And the guideposts for addressing that inquiry include the principles of religious neutrality I discussed earlier. See *630 supra, at 1842 - 1845. The government (whether federal, state, or local) may not favor, or align itself with, any particular creed. And that is nowhere more true than when officials and citizens come face to face in their shared institutions of governance. In performing civic functions and seeking civic benefits, each person of this nation must experience a government that belongs to one and all, irrespective of belief. And for its part, each government must ensure that its participatory processes will not classify those citizens by faith, or make relevant their religious differences.
To decide how Greece fares on that score, think again about how its prayer practice works, meeting after meeting.
*1850 The case, I think, has a fair bit in common with my earlier hypotheticals. See supra, at 1841 - 1843, 1844 - 1845. Let's say that a Muslim citizen of Greece goes before the Board to share her views on policy or request some permit. Maybe she wants the Board to put up a traffic light at a dangerous intersection; or maybe she needs a zoning variance to build an addition on her home. But just before she gets to say her piece, a minister deputized by the Town asks her to pray "in the name of God's only son Jesus Christ." App. 99a. She must think-it is hardly paranoia, but only the truth-that Christian worship has become entwined with local governance. And now she faces a choice-to pray alongside the majority as one of that group or somehow to register her deeply felt difference. She is a strong person, but that is no easy call-especially given that the room is small and her every action (or inaction) will be noticed. She does not wish to be rude to her neighbors, nor does she wish to aggravate the Board members whom she will soon be trying to persuade. And yet she does not want to acknowledge Christ's divinity, any more than many of her neighbors would want to deny that tenet. So assume she declines to participate with the others in the first act of the meeting-or even, as the majority proposes, that she stands up and leaves the room altogether, see ante, at 1826. At the least, she becomes a different kind of *631 citizen, one who will not join in the religious practice that the Town Board has chosen as reflecting its own and the community's most cherished beliefs. And she thus stands at a remove, based solely on religion, from her fellow citizens and her elected representatives.
Everything about that situation, I think, infringes the First Amendment. (And of course, as I noted earlier, it would do so no less if the Town's clergy always used the liturgy of some other religion. See supra, at 1842 - 1844.) That the Town Board selects, month after month and year after year, prayergivers who will reliably speak in the voice of Christianity, and so places itself behind a single creed. That in offering those sectarian prayers, the Board's chosen clergy members repeatedly call on individuals, prior to participating in local governance, to join in a form of worship that may be at odds with their own beliefs. That the clergy thus put some residents to the unenviable choice of either pretending to pray like the majority or declining to join its communal activity, at the very moment of petitioning their elected leaders. That the practice thus divides the citizenry, creating one class that shares the Board's own evident religious beliefs and another (far smaller) class that does not. And that the practice also alters a dissenting citizen's relationship with her government, making her religious difference salient when she seeks only to engage her elected representatives as would any other citizen.
None of this means that Greece's town hall must be religion- or prayer-free. "[W]e are a religious people," Marsh observed, 463 U.S., at 792, 103 S.Ct. 3330, and prayer draws some warrant from tradition in a town hall, as well as in Congress or a state legislature, see supra, at 1845 - 1846. What the circumstances here demand is the recognition that we are a pluralistic people too. When citizens of all faiths come to speak to each other and their elected representatives in a legislative session, the government must take especial care to ensure that the prayers they hear will seek to include, rather than *632 serve to divide. No more is required-but that much is crucial-to treat every citizen, of whatever religion, as an equal participant in her government.
And contrary to the majority's (and Justice ALITO's) view, see *1851 ante, at 1822 - 1823; ante, at 1817 - 1819, that is not difficult to do. If the Town Board had let its chaplains know that they should speak in nonsectarian terms, common to diverse religious groups, then no one would have valid grounds for complaint. See Joyner v. Forsyth County, 653 F.3d 341, 347 (C.A.4 2011) (Wilkinson, J.) (Such prayers show that "those of different creeds are in the end kindred spirits, united by a respect paid higher providence and by a belief in the importance of religious faith"). Priests and ministers, rabbis and imams give such invocations all the time; there is no great mystery to the project. (And providing that guidance would hardly have caused the Board to run afoul of the idea that "[t]he First Amendment is not a majority rule," as the Court (headspinningly) suggests, ante, at 1822; what does that is the Board's refusal to reach out to members of minority religious groups.) Or if the Board preferred, it might have invited clergy of many faiths to serve as chaplains, as the majority notes that Congress does. See ante, at 1820 - 1821. When one month a clergy member refers to Jesus, and the next to Allah or Jehovah-as the majority hopefully though counterfactually suggests happened here, see ante, at 1820 - 1821, 1823-the government does not identify itself with one religion or align itself with that faith's citizens, and the effect of even sectarian prayer is transformed. So Greece had multiple ways of incorporating prayer into its town meetings-reflecting all the ways that prayer (as most of us know from daily life) can forge common bonds, rather than divide. See also ante, at 1840 (BREYER, J., dissenting).
But Greece could not do what it did: infuse a participatory government body with one (and only one) faith, so that month in and month out, the citizens appearing before it become partly defined by their creed-as those who share, and *633 those who do not, the community's majority religious belief. In this country, when citizens go before the government, they go not as Christians or Muslims or Jews (or what have you), but just as Americans (or here, as Grecians). That is what it means to be an equal citizen, irrespective of religion. And that is what the Town of Greece precluded by so identifying itself with a single faith.
III
How, then, does the majority go so far astray, allowing the Town of Greece to turn its assemblies for citizens into a forum for Christian prayer? The answer does not lie in first principles: I have no doubt that every member of this Court believes as firmly as I that our institutions of government belong equally to all, regardless of faith. Rather, the error reflects two kinds of blindness. First, the majority misapprehends the facts of this case, as distinct from those characterizing traditional legislative prayer. And second, the majority misjudges the essential meaning of the religious worship in Greece's town hall, along with its capacity to exclude and divide.
The facts here matter to the constitutional issue; indeed, the majority itself acknowledges that the requisite inquiry-a "fact-sensitive" one-turns on "the setting in which the prayer arises and the audience to whom it is directed." Ante, at 1825. But then the majority glides right over those considerations-at least as they relate to the Town of Greece. When the majority analyzes the "setting" and "audience" for prayer, it focuses almost exclusively on Congress and the Nebraska Legislature, see ante, at 1818 - 1819, 1820 - 1821, 1823 - 1824, 1825 - 1826; it does not stop to analyze how far those factors differ in Greece's meetings. The majority thus gives short shrift to the gap-more like, *1852 the chasm-between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens. And similarly the majority neglects to consider how the prayers in Greece are mostly *634 addressed to members of the public, rather than (as in the forums it discusses) to the lawmakers. "The District Court in Marsh, " the majority expounds, "described the prayer exercise as 'an internal act' directed at the Nebraska Legislature's 'own members.' " Ante, at 1825 (quoting Chambers v. Marsh, 504 F.Supp., at 588); see ante, at 1825 (similarly noting that Nebraska senators "invoke[d] spiritual inspiration entirely for their own benefit" and that prayer in Congress is "religious worship for national representatives" only). Well, yes, so it is in Lincoln, and on Capitol Hill. But not in Greece, where as I have described, the chaplain faces the Town's residents-with the Board watching from on high-and calls on them to pray together. See supra, at 1846, 1847.
And of course-as the majority sidesteps as well-to pray in the name of Jesus Christ. In addressing the sectarian content of these prayers, the majority again changes the subject, preferring to explain what happens in other government bodies. The majority notes, for example, that Congress "welcom[es] ministers of many creeds," who commonly speak of "values that count as universal," ante, at 1821, 1823; and in that context, the majority opines, the fact "[t]hat a prayer is given in the name of Jesus, Allah, or Jehovah ... does not remove it from" Marsh 's protection, see ante, at 1823. But that case is not this one, as I have shown, because in Greece only Christian clergy members speak, and then mostly in the voice of their own religion; no Allah or Jehovah ever is mentioned. See supra, at 1847 - 1848. So all the majority can point to in the Town's practice is that the Board "maintains a policy of nondiscrimination," and "represent[s] that it would welcome a prayer by any minister or layman who wishe[s] to give one." Ante, at 1824. But that representation has never been publicized; nor has the Board (except for a few months surrounding this suit's filing) offered the chaplain's role to any non-Christian clergy or layman, in either Greece or its environs; nor has the Board ever provided its chaplains with guidance about reaching out to members of other faiths, *635 as most state legislatures and Congress do. See 732 F.Supp.2d 195, 197-203 (W.D.N.Y.2010) ; National Conference of State Legislatures, Inside the Legislative Process: Prayer Practices 5-145, 5-146 (2002); ante, at 1840 - 1841 (BREYER, J., dissenting). The majority thus errs in assimilating the Board's prayer practice to that of Congress or the Nebraska Legislature. Unlike those models, the Board is determinedly-and relentlessly-noninclusive.[5]
And the month in, month out sectarianism the Board chose for its meetings belies the majority's refrain that the prayers in Greece were "ceremonial" in nature. Ante, at 1823 - 1824, 1825, 1826, 1827 - 1828. Ceremonial references to the divine *1853 surely abound: The majority is right that "the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court' " each fits the bill. Ante, at 1825. But prayers evoking "the saving sacrifice of Jesus Christ on the cross," "the plan of redemption that is fulfilled in Jesus Christ," "the life and death, resurrection and ascension of the Savior Jesus Christ," the workings of the Holy Spirit, the events of Pentecost, and the belief that God "has raised up the Lord Jesus" and "will raise us, in our turn, and put us by His side"? See App. 56a, 88a-89a, 99a, 123a, 129a, 134a. No. These are statements of profound belief and deep meaning, subscribed to by many, denied by some. They "speak of the depths of [one's] life, of the source of *636 [one's] being, of [one's] ultimate concern, of what [one] take[s] seriously without any reservation." P. Tillich, The Shaking of the Foundations 57 (1948). If they (and the central tenets of other religions) ever become mere ceremony, this country will be a fundamentally different-and, I think, poorer-place to live.
But just for that reason, the not-so-implicit message of the majority's opinion-"What's the big deal, anyway?"-is mistaken. The content of Greece's prayers is a big deal, to Christians and non-Christians alike. A person's response to the doctrine, language, and imagery contained in those invocations reveals a core aspect of identity-who that person is and how she faces the world. And the responses of different individuals, in Greece and across this country, of course vary. Contrary to the majority's apparent view, such sectarian prayers are not "part of our expressive idiom" or "part of our heritage and tradition," assuming the word "our" refers to all Americans. Ante, at 1825. They express beliefs that are fundamental to some, foreign to others-and because that is so they carry the ever-present potential to both exclude and divide. The majority, I think, assesses too lightly the significance of these religious differences, and so fears too little the "religiously based divisiveness that the Establishment Clause seeks to avoid." Van Orden v. Perry, 545 U.S. 677, 704, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (BREYER, J., concurring in judgment). I would treat more seriously the multiplicity of Americans' religious commitments, along with the challenge they can pose to the project-the distinctively American project-of creating one from the many, and governing all as united.
IV
In 1790, George Washington traveled to Newport, Rhode Island, a longtime bastion of religious liberty and the home of the first community of American Jews. Among the citizens he met there was Moses Seixas, one of that congregation's lay officials. The ensuing exchange between the *637 two conveys, as well as anything I know, the promise this country makes to members of every religion.
Seixas wrote first, welcoming Washington to Newport. He spoke of "a deep sense of gratitude" for the new American Government-"a Government, which to bigotry gives no sanction, to persecution no assistance-but generously affording to All liberty of conscience, and immunities of Citizenship: deeming every one, of whatever Nation, tongue, or language, equal parts of the great governmental Machine." Address from Newport Hebrew Congregation (Aug. 17, 1790), in 6 PGW 286, n. 1 (M. Mastromarino ed. 1996). The first phrase there is the more poetic: a government that to "bigotry gives no sanction, to persecution no assistance." But the second is actually the more startling and transformative: a government that, beyond not aiding persecution, grants "immunities of *1854 citizenship" to the Christian and the Jew alike, and makes them "equal parts" of the whole country.
Washington responded the very next day. Like any successful politician, he appreciated a great line when he saw one-and knew to borrow it too. And so he repeated, word for word, Seixas's phrase about neither sanctioning bigotry nor assisting persecution. But he no less embraced the point Seixas had made about equality of citizenship. "It is now no more," Washington said, "that toleration is spoken of, as if it was by the indulgence of one class of people" to another, lesser one. For "[a]ll possess alike ... immunities of citizenship." Letter to Newport Hebrew Congregation (Aug. 18, 1790), in 6 PGW 285. That is America's promise in the First Amendment: full and equal membership in the polity for members of every religious group, assuming only that they, like anyone "who live[s] under [the Government's] protection[,] should demean themselves as good citizens." Ibid.
For me, that remarkable guarantee means at least this much: When the citizens of this country approach their government, *638 they do so only as Americans, not as members of one faith or another. And that means that even in a partly legislative body, they should not confront government-sponsored worship that divides them along religious lines. I believe, for all the reasons I have given, that the Town of Greece betrayed that promise. I therefore respectfully dissent from the Court's decision.

THE CHIEF JUSTICE and Justice ALITO join this opinion in full. Justice SCALIA and Justice THOMAS join this opinion except as to Part II-B.

This Court has never squarely addressed these barriers to the incorporation of the Establishment Clause. When the issue was first presented in Everson v. Board of Ed. of Ewing, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court casually asserted that "the Fourteenth Amendment [has been] interpreted to make the prohibitions of the First applicable to state action abridging religious freedom. There is every reason to give the same application and broad interpretation to the 'establishment of religion' clause." Id., at 15, 67 S.Ct. 504 (footnote omitted). The cases the Court cited in support of that proposition involved the Free Exercise Clause-which had been incorporated seven years earlier, in Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) -not the Establishment Clause. 330 U.S., at 15, n. 22, 67 S.Ct. 504 (collecting cases). Thus, in the space of a single paragraph and a nonresponsive string citation, the Everson Court glibly effected a sea change in constitutional law. The Court's inattention to these doctrinal questions might be explained, although not excused, by the rise of popular conceptions about "separation of church and state" as an "American" constitutional right. See generally P. Hamburger, Separation of Church and State 454-463 (2002); see also id., at 391-454 (discussing the role of nativist sentiment in the campaign for "separation" as an American ideal).

See, e.g., Del. Const., Art. I, § 1 (1831) ("[N]o man shall, or ought to be compelled to attend any religious worship, to contribute to the erection or support of any place of worship, or to the maintenance of any ministry, against his own free will and consent"); Me. Const., Art. I, § 3 (1820) ("[N]o one shall be hurt, molested or restrained in his person, liberty or estate, for worshiping God in the manner and season most agreeable to the dictates of his own conscience"); Mo. Const., Art. I, § 10 (1865) ("[N]o person can be compelled to erect, support, or attend any place of worship, or maintain any minister of the Gospel or teacher of religion"); R.I. Const., Art. I, § 3 (1842) ("[N]o man shall be compelled to frequent or to support any religious worship, place, or ministry whatever, except in fulfillment of his own voluntary contract"); Vt. Const., Ch. I, § 3 (1777) ("[N]o man ought, or of right can be compelled to attend any religious worship, or erect, or support any place of worship, or maintain any minister, contrary to the dictates of his conscience").

For ease of reference and to avoid confusion, I refer to Justice KENNEDY's opinion as "the majority." But the language I cite that appears in Part II-B of that opinion is, in fact, only attributable to a plurality of the Court.

Leaders of several Baptist and other Christian congregations have explained to the Court that "many Christians believe ... that their freedom of conscience is violated when they are pressured to participate in government prayer, because such acts of worship should only be performed voluntarily." Brief for Baptist Joint Committee for Religious Liberty et al. as Amici Curiae 18.

Justice ALITO similarly falters in attempting to excuse the Town Board's constant sectarianism. His concurring opinion takes great pains to show that the problem arose from a sort of bureaucratic glitch: The Town's clerks, he writes, merely "did a bad job in compiling the list" of chaplains. Ante, at 1818; see ante, at 1815 - 1817. Now I suppose one question that account raises is why in over a decade, no member of the Board noticed that the clerk's list was producing prayers of only one kind. But put that aside. Honest oversight or not, the problem remains: Every month for more than a decade, the Board aligned itself, through its prayer practices, with a single religion. That the concurring opinion thinks my objection to that is "really quite niggling," ante, at 1829, says all there is to say about the difference between our respective views.